**VELO–BIND, INCORPORATED,**
**Plaintiff,**

v.

**Eleanor SCHECK and Elliegraphics,**
**Ltd., Defendants.**

**79 Civ. 0006.**

United States District Court,
S. D. New York.

Oct. 31, 1979.

Lipkowitz & Plaut by Gerald D. Roth, Stephen Sussman, New York City, for plaintiff.

Pryor, Cashman, Sherman & Flynn by Sanford M. Goldman, Sandra L. Grayson, Seth Paprin, New York City, for defendants.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR PRELIMINARY INJUNCTION

MOTLEY, District Judge.

This is an unfair competition action brought by plaintiff Velo-Bind, Inc. (Velo-Bind), a California corporation, against defendant Eleanor Scheck, a New York resident, and the corporation of which she is sole owner, defendant Elliegraphics, Ltd., a New York corporation. It is brought pursuant to this court's diversity jurisdiction. 28 U.S.C. § 1332. Defendants are charged with appropriation of confidential proprietary information and customer lists from Velo-Bind, defendant Scheck's former employer. Defendants are also charged with wrongful solicitation of plaintiff's customers. Defendants are further charged with unfair competition in using the allegedly purloined material and information to establish a pricing structure for products sold by the corporate defendant to plaintiff's former customers. The matter is now before the court on plaintiff's motion for a preliminary injunction restraining defendants from soliciting or doing business with persons and entities who were plaintiff's customers before defendant Scheck left its employ on October 5, 1978; from using or disclosing the confidential data and proprietary information allegedly stolen by defendants; and from committing other acts of unfair competition against Velo-Bind.

The court finds that plaintiff is entitled to preliminary injunctive relief, having shown a probability of success on the merits and a possibility of irreparable harm flowing to it as a result of defendants' activities. The court holds that defendant Scheck breached the fiduciary obligation inherent in her relationship of employment with plaintiff by making use of plaintiff's customer list, which is entitled to trade secret protection, to establish a competing enterprise based predominately on the solicitation of plaintiff's customers.

*FACTS*

Velo-Bind is in the business of manufacturing and selling document-binding machines for use in offices and, after making such sales, providing binding supplies for purchasers of such equipment on a regular and continuing basis. The Velo-Bind binding system is patented. The essential economics of the Velo-Bind business is to sell basic binding machines for the purpose of obtaining ready-made customers for the repeat sale of consumable binding supplies used in conjunction with such machines.

Velo-Bind's present revenues are slightly in excess of $10 million annually, of which approximately 70 percent are made up of sales of binding supplies, which represent the more profitable side of the business. The balance of Velo-Bind's sales volume comes from the initial sale of machines, the sale price of which is kept low in order to obtain supply customers.

Velo-Bind's efforts to develop its business are conducted both at the national and branch office levels, and encompass virtually all aspects of company operations. Since the commencement of its operations in 1971, Velo-Bind's development expenditures have been in excess of $27 million, of which in excess of $16 million has been devoted solely to marketing expenditures. As a result of those substantial expenditures, Velo-Bind has incurred a $10 million deficit in retained earnings since 1971, experiencing its first profitable year in 1977.

Velo-Bind sells its machines through local representatives throughout the country, including branch offices in key cities, such as New York. There are also two authorized distributors of Velo-Bind machines and supplies, the A. B. Dick Company (A. B. Dick) and the Gestetner Corporation (Gestetner).

Velo-Bind's primary sales method is mail solicitation by salespersons (Equipment Representatives) of potential likely customers whose names are obtained from public and commercial directories and from information furnished by Velo-Bind's marketing staff headquartered in the company's main office in Sunnyvale, California. The corporate marketing staff supports the field sales effort through extensive market and customer based analysis, media advertising, providing sales materials, public relations programs and national lead generation programs. (The corporate lead generation programs are directed at identifying prequalified prospective customers for the field sales-force to call on.) Other specific corporation programs include participation in national trade shows and mail campaigns based on an analysis of Velo-Bind's existing customer base.

In the New York branch office, in an effort to show the desirability and reliability of Velo-Bind machines to potential new customers, names of satisfied lawyer customers (vertical lists) are sent to other lawyers and the same is done in the accounting and stock brokerage fields. Such reference selling is essential for the marketing of Velo-Bind machines as the product and the company are new.

The New York branch office succeeds in selling equipment to three (3) percent of its pre-screened targets, achieving a considerably better success rate than the national average.

Velo-Bind's marketing costs for the placement of one of its binding machines is in excess of $600. This placement cost excludes all other costs including manufacturing costs.

In the years since Velo-Bind commenced operations in 1971, it has placed 6,000 binding machines directly, and another 6,000 machines have been placed with end-users by the company's two authorized distributors, Gestetner and A. B. Dick. After a customer purchases a machine, Velo-Bind makes continuous sales to such customers of supply products for use in connection with the machine. The supply salespersons are located in Velo-Bind's branch offices.

Velo-Bind supply products consist of patented binding strips, "custom" covers, standard hard and composition covers, and paper, which are pre-punched for use with the machines. Graphic arts services are also provided to customers after the initial machine purchase. Except for the patented binding strips, the raw materials comprising Velo-Bind's supply products are purchased from public sources.

Prior to October 6, 1978, no one other than Velo-Bind, or one of its two authorized distributors offered a complete line of supplies to Velo-Bind machine owners. In order for anyone to effectively market a line of supply products to a Velo-Bind machine owner, that person would have to know the identity of those owners. Additionally, data as to a particular customer's needs and special requirements, which had been developed by Velo-Bind through its continuing relationships with its various customers, is very valuable in servicing such customers. Velo-Bind does not direct any of its marketing efforts of supply products to those persons or firms who have purchased machines from its distributors, A. B. Dick and Gestetner, because it does not know who those customers are as a group.

During the last fiscal year, ending December 31, 1978, the New York branch had supply revenues of $686,000 and equipment revenues of $202,000. Revenues derived from the sale of supply products in the New York branch reflect sales made by both Account Representatives and Equipment Representatives.

Velo-Bind maintains, *inter alia*, the following data concerning the special needs and requirements of its supply customers at the branch level; account (customer) record sheets, which contain the customer's name, address, telephone number and "contact person," the type of industry in which the customer is involved, customer number, type of equipment each has, dollar volume of sales by month and year and purchase history. Velo-Bind provides access to this customer information to all employees at the branch level where, as a practical matter, all persons in the branch need to know the data involved.

To protect its customer list from disclosures to non-employees, Velo-Bind utilizes various devices. At the commencement of employment, each employee signs an entitlement entitled "Agreement relating to inventions and secrecy," which provides, in pertinent part, that all "trade secrets" of the company are to be "preserved in secrecy during employment and thereafter" and that the employee will not "reveal to anyone the list of customers of Velo-Bind for one year after termination." Scheck signed such an agreement when she joined the company in 1974.

From the spring of 1974 until October 5, 1978, when she voluntarily left the company, defendant Scheck was employed by Velo-Bind primarily as an account representative to sell binding supplies (not equipment) to customers. The customers serviced by Scheck were those assigned to her after their purchase of Velo-Bind machines. Scheck's function as an Account Representative was to develop close contact with the customers assigned to her so as to maintain and increase their purchases of supplies as a result of a continuing determination of their needs and suggestions for additional usage of Velo-Bind machines and supplies. During the latter part of her employment, Scheck also performed additional part-time work training new Account Representatives, and was given the title of National Account Development Manager. During her employment at Velo-Bind, Scheck developed close personal contact with the customers she serviced and obtained an awareness of their particular needs and requirements. Scheck's combined salary and commissions amounted to about $30,000 annually during the latter part of her employment.

Of the approximately 450 supply customers at Velo-Bind's New York branch office on October 5, 1978, Scheck and her co-worker, Margaret Byrnes, serviced 406, the balance being serviced by equipment representatives.

By March of 1978 Scheck had become dissatisfied with her position at the company. There has been conflicting testimony as to whether Scheck began to express an interest in leaving the company at this time or at any time before August 1974, and as to whether she threatened to start a competing business before she left Velo-Bind. The court does not find it necessary to resolve these conflicts as it has found the underlying issues to be immaterial.

It has been established however, that by July, 1978 Scheck had decided to leave Velo-Bind and had begun the process of organizing her own competing company, Elliegraphics. By October 5, 1978, Scheck had done everything necessary to establish the new business, including the purchase of binding and related machines and supply inventory from a variety of sources and provision for the rendering of complementary services, such as hot-stamping services and storage space. These activities intensified, beginning in the latter part of July, 1978, when Scheck vacationed at weekly or bi-weekly intervals.

There has been some testimony that Scheck also engaged in certain activities while on the job at Velo-Bind, preparatory to establishing Elliegraphics. However, both of the witnesses who testified as to

these activities, which allegedly included phoning mills to obtain supply price quotations, are interested in the outcome of this litigation. Scheck, herself, who was one of the witnesses is an interested witness for reasons which are obvious. Margaret Byrnes, the other witness, is an interested witness because she has allegedly lost commissions as a result of Scheck's departure and subsequent events. Byrnes is also a continuing Velo-Bind employee, who may have been influenced in her testimony by her employer. Accordingly, the court finds that plaintiff has not sustained its burden of proving that the alleged improper pretermination activities on company time actually occurred.

The evidence in this case does establish, however, that immediately after Scheck left the employ of Velo-Bind, she commenced, and has proceeded on a systematic and continuing basis, to solicit Velo-Bind's (former) New York supply customers for the benefit of defendant Elliegraphics. Plaintiff has shown that the customers solicited include some which were among its best customers. Of the 406 supply customers which Scheck jointly serviced with Byrnes prior to her departure, defendants had sold supplies to 76 by the time of the hearings in this matter in early June, 1979. These sales thus occurred over a period of seven months. Furthermore, defendants solicited 150 of these 406 customers. Through May, 1979 defendants made sales of $125,861.24 to former customers of Velo-Bind. Based on defendants' average sales during the first five months of 1979, defendant' sales to former customers of plaintiff are proceeding at an annual rate of $282,000. Through May, 1979, defendants made sales aggregating only $1,171.91 to persons or firms who were not former customers of Velo-Bind, less than 1 percent of defendants' total sales. Scheck has not directed her sales efforts at the customers of plaintiff's two authorized distributors, A. B. Dick and Gestetner. Defendants claim that Scheck has, however, made extensive efforts to solicit business from non-Velo-Bind customers. The court has grave doubts on this score, and accords little weight to this testimony.

As a result of the 76 Velo-Bind customers shown by Elliegraphics' invoices to have made purchases from Elliegraphics after October 6, 1978, Velo-Bind has lost approximately $16,000 monthly in supply revenues. Plaintiff's aggregate average monthly sales to the 406 supply customers serviced in New York prior to Scheck's termination were $38,000. Plaintiff's percentage loss in revenues as a result of Scheck's activities is thus approximately forty-four percent.

*DISCUSSION*

The allegations of the complaint which are relevant to determination of this preliminary injunction motion are as follows.

First, it is alleged that defendant Scheck acquired the Velo-Bind customer list and other proprietary information in the form of "customer record sheets" by photocopying all or some of them before she left plaintiff's employ, and by reference to the commission statements (containing customer names) which she received monthly to enable her to check the amounts of commissions paid to her. Second, Velo-Bind contends that Scheck breached her fiduciary obligation to it, and the provisions of her employment agreement relating to trade secrets, by using the Velo-Bind customer list in her own business. Further, plaintiff alleges that Scheck's fiduciary obligations to it were breached when she performed certain acts, while still a Velo-Bind employee, preparatory to establishing defendant Elliegraphics, including, allegedly, solicitation of orders for the benefit of Elliegraphics from Velo-Bind customers. Finally, plaintiff alleges that virtually all of the business of Scheck and Elliegraphics is based on solicitations of and sales to its former customers.

Defendant Scheck answers these charges by denying that she ever physically copied the Velo-Bind customer list or customer record sheets. Scheck admitted to having possession of and having made reference to monthly commission statements and the customer names contained therein but argues that these were properly in her possession in the course of her employment with

Velo-Bind. Scheck denies that any acts performed by her in the establishment or operation of Elliegraphics constituted a breach of her fiduciary obligations to Velo-Bind, and insists upon her right to go into business for herself. Further, defendant argues that Velo-Bind is not entitled to restrict her post-employment competitive activities absent the existence of a valid contractual covenant not to compete between the parties (which concededly does not exist). Defendants point out, additionally, that such non-competition covenants are disfavored in the law.

Scheck argues that Velo-Bind's customer list is not protectable as a trade secret because it was culled from public sources and because certain "vertical lists" of actual customers were revealed to potential customers as a marketing or advertising device. Additionally, Scheck contends that she has extensively solicited non-Velo-Bind customers for Elliegraphics, and certain sales to such customers have in fact been shown. Finally, defendants say that any damages sustained by plaintiff are monetarily ascertainable, making injunctive relief unwarranted; that the "balance of equities" tips in defendants' favor, and that plaintiff's unclean hands should bar injunctive relief, since plaintiff communicated with certain of defendant's new customers when Elliegraphics was first formed, warning them not to deal with Scheck and that her activities were illegal.

The court will discuss the arguments of the parties seriatim.

There was considerable conflicting testimony on the question of whether Scheck physically copied the Velo-Bind customer list and proprietary data in the form of customer record sheets. Scheck testified in her own behalf while Velo-Bind relied on the testimony of Scheck's former co-worker Margaret Byrnes, a Velo-Bind employee. As noted above the court is of the view that neither witness was entirely credible, since both have an interest in the outcome of this litigation. Scheck is a party; Byrnes has testified to losing commissions as a result of the diversion of former Velo-Bind accounts to Elliegraphics.

■ Without regard to whether Scheck physically copied Velo-Bind's customer lists and other proprietary data, it has been shown that she had access to much of this material through her monthly commission statements. It may reasonably be inferred that she could also rely on memory, acquired through approximately four years of servicing the accounts. Actual physical copying is not essential to establish an unlawful appropriation of trade secrets, if the information involved is protectable as such, even though copying has been found in many of the cases in this area. See, e. g., *Hecht Foods Inc. v. Sherman*, 43 A.D.2d 850, 351 N.Y.S.2d 711 (2d Dept. 1974); *Harry R. Defler Corp. v. Kleeman*, 19 A.D.2d 396, 243 N.Y.S.2d 930, 936 (4th Dept. 1963), *app. dism.*, 13 N.Y.2d 1174, 248 N.Y.S.2d 53, 197 N.E.2d 540 (1964); *People's Coat, Apron & Towel Supply Co. v. Light*, 171 App.Div. 671, 157 N.Y.S. 15, 16 (1916), *aff'd*, 224 N.Y. 727, 121 N.E. 886 (1918). A useful discussion of this point is also found in *Lincoln Steel Products v. Schuster*, 49 A.D.2d 618, 371 N.Y.S.2d 157 (2d Dept.) (Shapiro, J., dissenting in part), *mot. dism'd*, 38 N.Y.2d 738, 381 N.Y.S.2d 41, 343 N.E.2d 759 (1975).

■ The key question thus becomes whether plaintiff's customer list is entitled to protection as a trade secret. This court finds that it is, since plaintiff has proven, by a fair preponderance of the credible evidence, that the list could not have been discovered or duplicated by anyone not privy to it. Defendants' argument that the list was culled from public sources such as Martindale-Hubbell's directory of law firms and the financial list, is unpersuasive on these facts. The truth of the matter is that Velo-Bind's supply customers consisted exclusively of owners of Velo-Bind machines. Thus, although all of their names might appear in publicly available directories, they were nowhere denominated as Velo-Bind machine owners except on the customer lists maintained by Velo-Bind, itself, and its two authorized distributors, Gestetner and A. B. Dick. This conclusion is buttressed by Velo-Bind's testimony that it was, itself,

unable to sell supplies to Gestetner and A. B. Dick customers, since it was unable to find out who they were.

The facts here are quite analogous to those found by the court in *Town & Country House & H. S. v. Newberry*, 3 N.Y.2d 554, 170 N.Y.S.2d 328, 147 N.E.2d 724 (1958), one of the leading decisions of New York's Court of Appeals in this area. There the plaintiff/employer operated an in-the-home cleaning service. The court observed that:

> "[T]he customers of plaintiff were not and could not be obtained merely by looking up their names in the telephone or city directory or going to any advertised locations, but had to be screened from among many other housewives who did not wish [such] services . . ., but preferred to do their own housework." 3 N.Y.2d 554, 559, 170 N.Y.S.2d 328, 332, 147 N.E.2d 724, 726.

Accordingly, the *Town & Country* court held, the customer list constituted a trade secret, the appropriation of which by a former employee might be enjoined.

The rule of law applicable on these facts was also stated by the *Town & Country* court:

> "[E]ven where a solicitor of business does not operate fraudulently under the banner of his former employer, he still may not solicit the latter's customers who are not openly engaged in business in advertised locations or whose availability as patrons cannot readily be ascertained but 'whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight have built up . . ..'" 3 N.Y.2d 554, 558, 170 N.Y.S.2d 328, 331, 147 N.E.2d 724, 726.

The defendants in *Town & Country* were enjoined from continued solicitation of plaintiff's customers. As is the case with the parties in the instant case, the employer and employee in *Town & Country* had not entered into any non-competition covenants.

The Court of Appeals reviewed a similar case, but reached a contrary result to that in *Town & Country*, in the latter case of *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972). In *Cream*, plaintiffs failed to prove physical appropriation or copying of confidential data, *and* failed to prove that the data allegedly used by defendants (again in the form of a customer list) constituted a trade secret because:

> "[P]laintiffs' customers are *likely*, if not known, users of the employers' merchandise and engaged in business at advertised locations." 29 N.Y.2d 387, 389, 328 N.Y.S.2d 423, 425, 278 N.E.2d 636, 637 (emphasis supplied).

Indeed, the court found, plaintiff's customers were "readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products," 29 N.Y.2d 387, 392, 328 N.Y.S.2d 423, 427, 278 N.E.2d 636, 639, precluding the attachment of trade secret protection. Finally, the court noted that the different result it had reached in *Town & Country* was attributable to the relatively greater ascertainability of the plaintiff/employer's customers in *Cream*. *See also Harry F. Defler Corp. v. Kleeman, supra*; *A.G.A. Aktiebolag v. A.B.A. Optical Corp.*, 441 F.Supp. 747 (E.D.N.Y.1977).

Defendants have attempted to defeat characterization of plaintiff's customer list as a trade secret by arguing that plaintiff failed to protect the customer list, revealing it to all the employees in its New York office and to certain prospective customers which it wished to recruit. These arguments cannot stand. Plaintiff has demonstrated to the court's satisfaction that its New York employees had access to customer information only on a "need to know" basis. Plaintiff's solicitation of prospective customers by dissemination of "vertical lists" of actual customers could not result in the lists becoming available to plaintiff's competitors, since none of the recipients were potential competitors.

Dissemination of a customer list to prospective customers was found to prevent

trade secret protection in *Public Relations Aids, Inc. v. Wagner*, 37 A.D.2d 293, 324 N.Y.S.2d 920, 922 (1st Dept. 1971), *aff'd* 30 N.Y.2d 890, 335 N.Y.S.2d 439, 286 N.E.2d 922 (1972), as defendants note. However, the business involved in *Wagner* was advertising, and there the court also found that:

"[T]he names of such customers would be well known to any one in the business of public relations, and any list of prospects could be easily and readily compiled from various available sources." 37 A.2d 292, 296, 324 N.Y.S.2d 920, 922.

*Wagner* is thus readily distinguishable from this case.

■ The foregoing authorities reveal that where a customer list constitutes a trade secret, it need not have been "physically appropriated" in order to enjoin the departed employee from soliciting the plaintiff/employer's customers.

■ Furthermore, defendant's argument that she cannot be enjoined from soliciting plaintiff's customers in the absence of a valid non-competitive covenant must also fall. Appropriation of a former employer's customer list is a violation of the fiduciary obligation inherent in the employer/employee relationship where the customer list is protectible as a trade secret. *Town & Country, supra.* Since a restrictive covenant is not essential to create liability, defendants' argument with respect to the disfavor with which such covenants are traditionally viewed becomes irrelevant. It is noteworthy, however, that such restrictive covenants are upheld where necessary to protect an employer's *trade secrets*, or where no other breach in fiduciary obligation is shown, or where the employee's services are unique, as long as they are reasonable in scope. Only where no such considerations are involved will the courts "see no reason to inhibit the employee's activity to realize his potential both professionally and financially by availing himself of opportunity." *Reed Roberts & Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976).

■ To recapitulate, it is not possible to have achieved the level of sales to former Velo-Bind customers which was realized by defendants except by direct reliance on known Velo-Bind customers. In such a case, the customer list is entitled to protection as a trade secret and its utilization by a former employee constitutes a breach of fiduciary obligation which may be enjoined, even absent a specific covenant not to compete.

"What these categories of injury all have in common is the prospect that the employee will affirmatively harm the former employer other than through merely being productive for another employer. . . . Where a trade secret is involved, what is at stake is a company asset which, like the business of a major customer, is not inextricably related to that special talent of the employee which New York law seeks to keep productive for the public benefit." *Diaz v. Indian Head, Inc.*, 402 F.Supp. 111 (N.D.Ill.), *aff'd*, 525 F.2d 694 (7th Cir. 1975) (applying New York law).

■ By siphoning off plaintiff's carefully gleaned customers, defendants subject plaintiff to a definite possibility of irreparable harm, which increases as long as it continues unrestrained. What is at stake here is plaintiff's good will built up over the years, which is not, contrary to defendant's assertion, monetarily ascertainable. Plaintiffs have demonstrated a substantial probability of success on the merits, in light of the authorities reviewed above and their application to the facts thus far established. *Caulfield v. Board of Education*, 583 F.2d 605 (2d Cir. 1978).

Accordingly, defendants shall be enjoined from continuing in their solicitation of those accounts which were customers of plaintiff during her tenure as a Velo-Bind employee, or from otherwise unfairly competing with plaintiff.

The issue of whether defendant Scheck breached her covenant, contained in her 1974 employment agreement with plaintiff, not to reveal trade secrets, shall be reserved for the trial of this matter when the issue of damages generally will be taken up.

Submit order in five days on five days' notice.