BUSINESS INTELLIGENCE SERVICES, INC., Plaintiff,

v.

**Carole HUDSON, Defendant.**

**No. 84 Civ. 0164 (RWS).**

United States District Court, S.D. New York.

Jan. 27, 1984.

As Amended Feb. 1, 1984.

Winthrop, Stimson, Putnam & Roberts, New York City, for plaintiff; Francis Carling, Leo T. Crowley, New York City, of counsel.

Baratta & Goldstein, New York City, for defendant; Howard J. Goldstein, New York City, Margaret M. Stanton, Freeport, N.Y., of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Business Intelligence Services, Inc., a New York corporation, ("BIS") seeks to enjoin defendant Carole Hudson ("Hudson"), its former senior consultant, from working for Management Technologies, Inc. ("MTI"), a competitor. Diversity jurisdiction exists in accordance with 28 U.S.C. § 1332(a)(2). Upon a one-day hearing on January 23, 1984 and the following findings of fact and conclusions of law, the requested relief will be granted, and Hudson, the recent and relatively innocent casualty of the competition between BIS and MTI, will be enjoined from commencing employment with MTI until February 1, 1985.

Hudson is a citizen of Great Britain, currently residing in Manhattan. She graduated from college in England and went to work in London as a trainee for Business Intelligence Services Software Ltd. ("Software"), the parent of BIS. Both Software and BIS are engaged in developing, producing, marketing, licensing, leasing and maintaining computer software. This software can be described as computer programs designed and developed for use by international financial institutions engaged in international multi-currency transactions.

In London, Hudson progressed to programmer of systems, to senior programmer, and then to consultant. Her duties included the development and installation of the products of Software and acting as liaison with clients of her employer for whom she provided consulting services. In that capacity she had come to New York on two occasions prior to June 1983 when she commenced working for BIS. Upon her arrival at BIS, she was given a number of documents including two copies of an employment contract which she took home one evening and studied for ten to fifteen minutes. She believed she signed the contract but no executed contract was produced by either side, and her recollection was uncertain about the execution. In any case she had no question concerning the contract which required her to hold in confidence information acquired in the employment of BIS but did not contain a clause barring employment by a competitor.

Hudson initially had reservations about coming to New York based on her prior observation of the New York firm and its "flat" structure as well as certain of its equipment deficiencies. She had known Barrington J. Fludgate ("Fludgate"), a former Software employee, who had previously come to New York as president of BIS. In 1981 Fludgate had left BIS and formed a competing company, MTI. About one-third of MTI's employees are former employees of Software or BIS. Hudson and Fludgate met in the summer of 1983, and the social amenities progressed to discussions of employment. By letter, Fludgate on August 17 offered Hudson employment, and by early fall they had reached an agreement for Hudson to move to MTI at an increased salary with the understanding that she would return to London to direct the London office of MTI or a substantial

part of its operation after she had become familiar with MTI's system and operation in New York.

During the summer of 1983 Hudson had voiced her criticism of BIS, its structure and facilities to her supervisor Sharon Wolins ("Wolins") who thereafter recommended that Hudson become a senior consultant. Hudson received the recommended promotion. Another BIS employee with whom Hudson had a close relationship expressed interest in leaving but after discussions decided to remain with BIS.

On September 9, 1983, Wolins told Hudson that the files contained no employment contract for her and that such a contract was required. Hudson checked her files and was unable to locate the contract given to her in June. Hudson testified that "Paula Murphy, who was then the secretary to the president, came down to me and told me that she had retyped my contract and for me to sign." Transcript at 146. Murphy further advised Hudson that she (Miss Murphy) had been instructed to stay until the contract was signed. Hudson signed the contract without reading it. It contained the following clause which BIS now seeks to enforce:

> You agree with the Company that for a period of twelve calendar months following the termination of your employment you will not work for nor render services to or for the benefit of nor otherwise be interested in (whether as an employee, consultant, proprietor or otherwise howsoever) any business or part of a business of any person, firm, or company which is carried on in competition with any part of the business of the Company wherever located, in or for which you worked or were otherwise involved at any time within the twelve months preceding the termination of your employment.

Hudson applied for the necessary change in visa status, supported by a letter from MTI, and continued to work for BIS until December 29 when she turned in a letter of resignation. The following day she met with Anna Shuster ("Shuster") director of personnel for BIS and advised her that she intended to work for a BIS competitor. Later that day she met with Shuster and John Person ("Person"), the new president of BIS, hired in September. Shuster noted the existence of the noncompetition clause. Hudson said she did not believe it would be a problem. She had in fact shown the June contract to her immigration lawyer, in connection with her visa application some time in October. It was between the meeting with Shuster and the meeting with Shuster and Person on December 30 that Hudson realized that the contract she signed in September differed from the June draft. Person sought to persuade Hudson to stay with BIS. Hudson declined and refused to state the name of the firm for which she intended to work but acknowledged that it was a competitor. Person stated that her employment contract would present a problem as a consequence of the non competition clause quoted above. At some time during her interviews on December 30, Hudson expressed her view that she had signed a different contract. Unable to reach an accommodation, Person and Hudson agreed to a four week notice. Hudson presently intends to commence her employment with MTI on February 1, 1984. This action was commenced on January 9, expedited discovery was permitted and BIS's motion was heard on January 23 when Person, Wolins, Shuster, Hudson and Fludgate and John Colman, a BIS senior consultant, testified.

There is no evidence that Hudson will be unable to gain employment for the next year with an organization not in direct competition with BIS which would not be precluded by her contract, nor indeed that she could not continue with BIS. Further, there is no evidence in this record that she is anything other than an extremely competent, able professional, faithful to her commitments as she believed them to exist, nor any reason to conclude that her status as a pawn in the competition between BIS and MTI should affect her employability in a negative fashion.

Based on the number of clients and employees, MTI is between one-third to one-fifth the size of BIS. Both BIS and MTI deal with packaged software, that is, programs which are designed for use by particular types of institutions, in this instance international banks, rather than computer programs custom designed for only one client. The BIS program for international currency management is called, appropriately enough, MIDAS. MTI has a program which competes with MIDAS termed MANTEC. When employed by a corporation subsequently acquired by Software, Fludgate designed MIDAS. Fludgate also participated in the design of MANTEC. MIDAS has a number of modules, that is, additional programs which can be made to interface with each other. Both MIDAS and MANTEC have source codes which are required to change, correct or alter the programs, to respond to problems which occur during operations, to add new programs or to correct old programs.

BIS and Software grant world-wide licenses under which are the only circumstances under which source codes are revealed to clients and then under certain additional protections. Otherwise, except on rare occasions, the source codes are held in confidence as are the programs. In addition, both BIS and MTI seek to keep confidential their new developments, problems with clients, and potential clients.

BIS has initiated litigation in another forum alleging that at least one of its former employees, now employed by MTI, has turned over trade secrets and confidential information to MTI. BIS and MTI are vigorous competitors in the rapidly developing market for computer software where design and program are paramount. Although BIS and MTI use different computer language, there are design and program features of each system which might be used to improve the other. It takes from three to six months to design a program and some time thereafter for it to be installed and become operational.

■ The September 9, 1983 contract of employment is valid on its face and was executed by Hudson on that day. Although Hudson failed to read the contract, she is bound by its terms. *See Avila Group, Inc. v. Norma J. of California,* 426 F.Supp. 537, 540 (S.D.N.Y.1977). Hudson was not coerced into signing the September contract. While a misrepresentation was made to Hudson to the effect that the September contract was a retyped version of the earlier contract, there is no evidence that this representation was fraudulent, that is, made with intent to deceive.

There are circumstances from which some inference of fraud might be drawn, the imminent change in the presidency of BIS requiring a cleaning up of administrative details, the prior raids on BIS personnel, the possible departure of at least one other BIS employee, and obviously, the acknowledged competition between BIS and MTI as well as other firms in the field. These circumstances, however, fail to supply a preponderance of evidence that BIS intended to defraud Hudson by deliberately making a false representation concerning retyping. To reach such a conclusion on this record in the absence of testimony by the BIS actors during the event would constitute speculation rather than a logical, rational inference that Ms. Murphy stated what she believed to be true.

■ Under New York law, a noncompetition agreement is enforceable if the restriction is reasonable in scope and duration and necessary to protect against the disclosure of trade secrets or other confidential information, or solicitation of customers, or when the employee's services are unique or extraordinary. *See Continental Group, Inc. v. Kinsley,* 422 F.Supp. 838, 843 (D.Conn.1976); *Reed Roberts Assoc., Inc. v. Strauman,* 40 N.Y.2d 303, 308, 386 N.Y. S.2d 677, 680, 353 N.E.2d 590, 593, (1976); *Purchasing Assocs., Inc. v. Weitz,* 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245, 248 (1963).

The prerequisites for issuance of a preliminary injunction in this Circuit are, *one,* irreparable harm and, *two,* either (a) likelihood of success on the merits or (b) the existence of sufficiently serious questions

on the merits to make them a fair ground for litigation, combined with a balance of hardships tipping decidedly toward the party seeking the preliminary injunction. *United States v. Siemens Corp.*, 621 F.2d 499, 505 (2d Cir.1980).

■ BIS will suffer irreparable harm if Hudson goes to work for MTI because Hudson has extensive knowledge of BIS computer software and BIS client information. The disclosure of Hudson's knowledge of BIS's software system to MTI would allow a competitor to develop or improve its computing system with little or no effort. Computer software has received judicial recognition as a trade secret. *See Matter of Belth v. Insurance Dept. of New York*, 95 Misc.2d 18, 406 N.Y.S.2d 649 (Sup. Ct.1977) (description of computer program and details of mathematical models, procedures and statistical assumptions developed by an insurance company constitute trade secrets); *Trio Laboratories, Inc. v. Computer Energy Corporation*, 36 A.D.2d 750, 320 N.Y.S.2d 445 (2d Dep't 1971) (computer programs and information relating thereto deemed trade secrets); *Minnesota Mining and Manufacturing Co. v. Technical Tape Corp.*, 23 Misc.2d 671, 678–84, 192 N.Y. S.2d 102, 112–15 (Sup.Ct.1959), *aff'd*, 15 A.D.2d 960, 226 N.Y.S.2d 1021 (1962) (defining term "trade secret" to include computer software).

Client information, such as data on the types of hardware and software ordered by specific clients, lists of products sold to clients but not yet developed and problems arising in the course of client relations, are also protectible as a trade secret. *See Greenwich Mills Co., Inc. v. Barrie House Coffee Co., Inc.*, 91 A.D.2d 398, 405, 459 N.Y.S.2d 454, 459 (1983) (the confidential information concerning various customers' preferences for particular precise blends of coffee and price customers willing to pay for such blends constitutes sufficient allegations of trade secrets to preclude summary judgment); *Town & Country House & Home Service, Inc. v. Newbery*, 3 N.Y.2d 554, 559, 170 N.Y.S.2d 328, 332, 147 N.E.2d 724, 726 (1958) (information concerning an employer's customers held to be a protectible trade secret because customers had to be screened from many potential customers).

The irreparability of the injury to BIS if the injunction is not granted is established by the ephemeral and essential quality of the knowledge which Hudson has the capacity to convey to MTI, were she to violate her covenant not to disclose confidential information. Were she to violate the agreement, it would be difficult in the extreme to establish the existence of the injury as well as the amount of any monetary damage. Given Hudson's knowledge of the BIS software and BIS client relations, BIS will suffer irreparable harm if Hudson discloses such information to a competitor such as MTI. Moreover, such disclosure is likely, if not inevitable and inadvertent, if Hudson commences employment with MTI.

■ According to Hudson, BIS is not likely to succeed on the merits because the noncompetition clause is unreasonable in duration and geographical scope, is not necessary for the protection of BIS, unreasonably burdens Hudson, and is against public policy. *See Reed Roberts, Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y. S.2d 677, 679, 353 N.E.2d 590, 592–93 (1976). The reasonableness of the clause must be measured by the circumstances and the context in which enforcement is sought. *See Gelder Medical Group v. Webber*, 41 N.Y.2d 680, 685, 394 N.Y.S.2d 867, 871, 363 N.E.2d 573, 577 (1977).

The one year restriction on Hudson's employment by a BIS competitor is not an unreasonable limitation in this case. BIS has expended considerable time, effort and money in developing its software programs. Hudson has knowledge and information with respect to the BIS accounts she has been servicing including difficulties in the BIS software, at least one of which is major, which have been presented in the course of installation and operation. She also is aware of the existing programs and has information concerning the source codes, although, of course, the codes themselves are in document form. She is aware

of the various modules currently available for MIDAS and the current operation of the systems used by the BIS clients for whom she has been providing consulting services. She is not directly involved in the development or design of new programs but has information which could be useful in such an undertaking. Within a year her knowledge of these matters will be outdated and of little use. Prior to that time disclosure of Hudson's knowledge to MTI would harm BIS and provide a competitive advantage to MTI.

The unlimited geographic scope of the restrictive covenant is more troublesome, but BIS's business is worldwide. In *Continental Group, Inc. v. Kinsley, supra,* the court upheld as reasonable a noncompetition agreement covering the United States, Canada, Western Europe and Japan because the former employer's product was being developed in each of those areas. Moreover, in *Mixing Equipment Co., Inc. v. Philadelphia Gear, Inc.,* 436 F.2d 1308, 1314 (3d Cir.1971) (applying New York law), a covenant with no geographical limitation was held valid because it was sufficiently limited as to time. Like the noncompetition clause in the present case, the duration of the restriction was limited to one year. Accordingly, I find the worldwide scope of the noncompetition clause not unreasonable, given the international nature of BIS's business.

Based on the conclusions reached above, it is probable that BIS will prevail on the merits. Further, the balancing of harm as between Hudson and BIS tips against Hudson as a consequence of the facts found above.

In accordance with these findings and conclusions, a preliminary injunction will issue today conditioned upon the filing of a $50,000 bond.

IT IS SO ORDERED.