**CHURCHILL COMMUNICATIONS CORPORATION, Plaintiff,**

v.

**Robert DEMYANOVICH, Robert Marone, John Czuczak, Cel Industries, Inc. d/b/a Mail Processing Center and Diversified Data Communications, Inc., Defendants.**

No. 87 Civ. 4339 (JMC).

United States District Court, S.D. New York.

Aug. 10, 1987.

**208**

Paul D. Wexler, Bragar & Wexler, New York City, for plaintiff.

David L. Wanetik, New York City, for defendants Robert Demyanovich, Robert Marone, John Czuczak and CEL Industries, Inc.

Glenn Backer, Dahan & Nowick, New York City, for defendant Diversified Data Communications, Inc.

## MEMORANDUM AND ORDER

CANNELLA, District Judge.

Plaintiff's application for a preliminary injunction is granted in part and denied in part. Fed.R.Civ.P. 65(a).

## BACKGROUND

Plaintiff Churchill Communications Corporation ["Churchill"], commenced this diversity action by Order to Show Cause, seeking to enjoin defendants Robert Demyanovich, Robert Marone and John Czuczak, all former employees, from competing against it in the geographic areas in which it conducts its electronic message processing business. Churchill seeks to enforce restrictive covenants entered into by it and the three former employees. In addition, Churchill seeks to enjoin defendants CEL Industries, Inc., ["CEL"], an Illinois corporation 90 percent owned by Demyanovich with its principal place of business in New Jersey, and Diversified Data Communications, ["Diversified"], a Michigan corporation, from soliciting electronic message business from Churchill customers.

A preliminary injunction hearing was held on July 13–14, 1987. At the outset, defendant Marone was dismissed from the case, without prejudice, because his New York residence would have destroyed diversity jurisdiction. At the close of plaintiff's case, the Court granted defense motions for denial of preliminary injunctive relief as to defendants Czuzcak and Diversified, there having been little or no evidence presented against them. The case proceeded against Demyanovich and CEL. This Memorandum and Order sets forth the Court's findings of fact and conclusions of law.

## FACTS

Robert Demyanovich began working at Churchill in 1978 as a messenger. At the time of his departure in the spring of 1987, he had risen to the post of corporate vice president. By that time, Demyanovich was second only to Churchill President Mark Roter in terms of responsibility for Churchill's operations. In March 1982, and again in August 1986, Demyanovich entered into a confidentiality agreement/restrictive covenant with Churchill, whereby he agreed (1) not to disclose information about Churchill acquired during the course of his employment; (2) not to engage in, for a period of two years following the termination of his employment with Churchill "for any reason," "any business which is competitive with the electronic message processing business of [Churchill] in geographic areas in which such business is conducted by [Churchill];" and (3) not to unfairly interfere with Churchill's business or to raid Churchill's employees. Demyanovich also agreed that in the event he breached the covenant, Churchill would "be entitled to obtain injunctive relief." [1] Credible evidence was also introduced which tended to show that Demyanovich had a substantial role in developing and drafting the confidentiality agreements/restrictive

---

1. A copy of the restrictive covenant is attached as an appendix to this Memorandum and Order.

covenants which he and other Churchill employees were required to sign.[2]

Before coming to Churchill, Robert Marone had been employed by Western Union as a sales representative for its mailgram product. While working for Western Union, he became acquainted with Demyanovich and directed mailgram business to Churchill. In February 1985, Marone joined Churchill's sales force. In March, he signed a restrictive covenant similar to the one signed by Demyanovich. Approximately one year later, Marone was dismissed from Churchill due to poor performance.

Following his dismissal, Marone was offered a position with Western Union, but was not ultimately hired because of the restrictive covenant. Marone then commenced a declaratory judgment action in New York State Supreme Court in an attempt to have the restrictive covenant declared unenforceable. As part of a settlement in that case, Churchill agreed to allow Marone to work for Electronic Mail Corporation of America ["EMCA"], a minor competitor. Marone was subsequently laid off by EMCA in March 1987 and joined the sales force of CEL the next month.

John Czuczak had also been employed by Western Union prior to working for Churchill. In the fall of 1984, however, Western Union began scaling down the size of its sales force, and Czuczak's employment was terminated. Because of Western Union's decision regarding its sales force, Churchill made a determined effort to hire former Western Union sales personnel. In the summer of 1985, Czuczak joined Churchill and, in August 1986, he signed a restrictive covenant virtually identical to the ones signed by Demyanovich and Marone. In March 1987, Czuczak resigned from Churchill. He has since commenced working for CEL.

Churchill produces no product of its own, but rather, is a reseller, or broker, for the electronic message products of other companies, such as Western Union, MCI and GTE. Organizations with a need to communicate quickly with a large number of individuals, as, for example, in a manufacturer's recall of its product, may resort to using Western Union's mailgram. The mailgram is an electronically-generated letter that is delivered through the regular mail service offered by the United States Postal Service. It is created when a message or text generated by the sender is transmitted through Western Union to designated post offices around the country which contain computer terminals designed to receive and process the messages. The messages are then printed out, placed into envelopes and delivered to the recipient. If the message is received at the appropriate post office by a certain time, delivery is normally guaranteed by the next business day.

Churchill does not produce the mailgram itself. Rather, it acts as a customer servicing agent for the mailgram product and has a contractual arrangement with Western Union. A somewhat typical use of Churchill's services was described during the hearing. Large investment firms often use the mailgram in order to notify clients of approaching margin calls. The message, along with the name and address of the recipient, is received by Churchill, which formats the information and relays it to Western Union for transmission to the appropriate post office. The investment firm is considered Churchill's client and is billed directly by it. Churchill is billed by Western Union for the use of its transmission lines.

In January 1987, Demyanovich informed Mark Roter of his intention to leave Churchill. That same month, he formed CEL. Approximately 65 percent of CEL's business is in direct mail processing, a business in which Churchill is not engaged. The remaining 35 percent of CEL's business is in electronic message processing and, to a lesser extent, video communications. As part of his plans for the future, Demyanovich hoped to work out an ar-

2. Virtually identical restrictive covenants were entered into by defendants Marone (March 4, 1985) and Czuczak (August 26, 1986).

rangement with Churchill whereby CEL would act as Churchill's agent in New Jersey and as an independent reseller of Churchill's services in those states not covered by Demyanovich's confidentiality agreement. Although Roter and Demyanovich negotiated for a time, no agreement was ever consummated.

CEL began conducting business in March. As stated above, Marone and Czuczak eventually joined CEL's sales force. Churchill soon discovered that CEL employees were soliciting former Churchill customers, either through direct mail solicitation or via telemarketing efforts. Roter also discovered that certain Churchill business records, computer disks and customer lists were missing. A criminal complaint against Demyanovich was sworn to by Roter and a search of Demyanovich's New Jersey home and office was conducted by local police. The search revealed a number of different computer printouts containing the names and addresses of Churchill customers, along with information concerning the type, volume and frequency of their electronic message needs, the prices charged by Churchill and the contact person within the organization.

Churchill commenced this action for the purpose of: (1) restraining defendants from soliciting and/or processing electronic message services for Churchill customers; (2) restraining defendants from continuing to use confidential customer lists or information in either their solicitation of Churchill's customers, or in competing with Churchill; (3) obtaining the return of all Churchill property and business records in Demyanovich's possession; and (4) restraining defendants from competing with Churchill in the geographic areas in which it conducts its business. Churchill has agreed to limit these areas to the states of New York, New Jersey, Connecticut, Maryland, Pennsylvania and Virginia and Washington, D.C.[3]

## DISCUSSION

In order to obtain preliminary injunctive relief, Churchill must establish "(A) irreparable harm [in the absence of the requested relief], and (B) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir.1981); *see Jackson Dairy Inc. v. H.P. Hood & Sons Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

## A. THE MERITS OF CHURCHILL'S CLAIM

In August 1986, Demyanovich signed the restrictive covenant that forms the basis for the injunctive relief sought by Churchill. In that covenant, Demyanovich agreed that Churchill customer lists are the "exclusive property" of the company, Appendix at ¶ 1, and further agreed not to "directly or indirectly, individually or as a principal, stockholder, director, partner, employee, officer, agent or consultant, engage in any business which is competitive with the electronic message processing business of [Churchill] in geographic areas in which such business is conducted." *Id.* ¶ 3.

■ Under New York law, restrictive covenants are subject to rigorous scrutiny

3. These are the geographic areas in which Churchill conducts its business. In a reply affidavit, Churchill President Mark Roter appears to back away from this last request. He states that Churchill "merely [seeks] to prevent these defendants from soliciting and/or doing business *with Churchill customers for two years.*" Reply Affidavit of Mark Roter at 7, 87 Civ. 4339 (JMC) (S.D.N.Y. July 8, 1987) (emphasis added). In any event, the Court believes that an enforcement of the covenant's provisions which would bar the defendants from engaging in the electronic message processing industry generally, whether in the geographic areas mentioned or elsewhere, would be contrary to the declared public policy in New York favoring open competition and militating "against sanctioning the loss of a man's livelihood." *Purchasing Assocs. v. Weitz,* 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 603, 196 N.E.2d 245, 247 (1963). Of course, under New York law, the Court is permitted "to 'sever' the impermissible from the valid and uphold [a restrictive] covenant to the extent that it is reasonable." *Karpinski v. Ingrasci,* 28 N.Y.2d 45, 51, 320 N.Y.S.2d 1, 6, 268 N.E.2d 751, 754 (1971).

because of "the general public policy favoring robust and uninhibited competition," *American Broadcasting Companies, Inc. v. Wolf,* 52 N.Y.2d 394, 404, 438 N.Y.S.2d 482, 487, 420 N.E.2d 363, 368 (1981), as well as "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *Purchasing Associates, Inc. v. Weitz,* 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 603, 196 N.E.2d 245, 247 (1963). Accordingly, a restrictive covenant "is not only subject to the overriding limitation of 'reasonableness'", *id.,* but will be enforced "only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists," *Columbia Ribbon & Carbon Mfg. v. A-1-A Corp.,* 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4, 6 (1977), or "confidential customer information." *Reed, Roberts Assocs. Inc. v. Strauman,* 40 N.Y.2d 303, 308, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590, 593 (1976). Of course, an employee's use of an employer's trade secrets or confidential customer information can be enjoined even in the absence of a restrictive covenant when such conduct violates a fiduciary duty owed by the former employee to his former employer. *See Biofactures Corp. v. Greenberg,* 103 A.D.2d 834, 478 N.Y.S.2d 344, 346 (2d Dep't 1984); *McKay v. Communispond, Inc.,* 581 F.Supp. 801, 806 (S.D.N.Y.1983); *Velo-Bind, Inc. v. Scheck,* 485 F.Supp. 102, 109 (S.D.N.Y.1979).

Roter testified that Churchill currently has approximately 2000 to 2200 "active" customers, Transcript ["T."] at 32, 66–67, which he defined as "[a]nybody who has done business with us over the past 2 years." T. at 67. Although no single customer list was produced, a number of exhibits were introduced into evidence containing lists of names, addresses, accounts receivable information and the names of contact persons with whom Churchill conducts its business. These documents and records, including a comprehensive Christmas card mailing list containing the name and address of and contact person at virtually every Churchill customer, *see* Plaintiff's Ex. 22, were found in Demyanovich's possession.

The rules regarding the confidential nature of customer lists are well established. Generally, "where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products, trade secret protection will not attach and courts will not enjoin the [former] employee from soliciting his employer's customers." *Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 392, 328 N.Y.S.2d 423, 427, 278 N.E.2d 636, 639 (1972); *see Town & Country House & Home Service v. Newbery,* 3 N.Y.2d 554, 558, 170 N.Y.S.2d 328, 331, 147 N.E.2d 724, 727 (1958); *accord American Institute of Chemical Engineers v. Reber-Friel Co.,* 682 F.2d 382, 387 (2d Cir.1982); *Ability Search, Inc. v. Lawson,* 556 F.Supp. 9, 15 (S.D.N.Y.1981), *aff'd,* 697 F.2d 287 (2d Cir.1982); *Velo-Bind,* 485 F.Supp. at 108; *Rubin v. First Coinvestors, Inc.,* 91 A.D.2d 630, 456 N.Y.S.2d 813, 814 (2d Dep't 1982).

Nevertheless, "[i]f there has been a physical taking or studied copying, the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence" by the employee while in the service of his employer. *Leo Silfen, Inc.,* 29 N.Y.2d at 391–92, 328 N.Y.S.2d at 427, 278 N.E.2d at 639; *see Reed, Roberts Assocs.,* 40 N.Y.2d at 308, 386 N.Y.S.2d at 680, 353 N.E.2d at 593; *AGA Aktiebolag v. ABA Optical Corp.,* 441 F.Supp. 747, 754 (E.D.N.Y.1977) ("[C]ustomer lists are protected ... where an employee appropriates the list by copying or studied memory.").

Demyanovich's and CEL's main defense is that the identities of Churchill's customers cannot be considered confidential in nature because the customers are mostly large investment firms, banks and corporations openly engaged in business and easily discoverable through the use of business directories. Churchill argues that, although the identity, business and address of many of its customers are readily ascertainable, what is confidential is (1) the fact

that these companies use electronic message services; (2) the type, volume and frequency of such services; (3) the prices the particular customers are willing to pay; and most significantly, (4) the contact person within the organization responsible for authorizing the use of, or ordering electronic message service.

■ In the Court's view, virtually *any* organization that utilizes regular postal services is a *potential* user of electronic mail services. Thus, standing alone, the fact that a company, which is openly engaged in business, has already been "sold" on the idea of electronic mail does not necessarily qualify its identity as an electronic mail user a protectible trade secret. *See Reed, Roberts Assocs.,* 40 N.Y.2d at 308, 386 N.Y.S.2d at 680, 353 N.E.2d at 593; *Leo Silfen, Inc.,* 29 N.Y.2d at 394, 328 N.Y.S.2d at 429, 278 N.E.2d at 640; *Abdallah v. Crandall,* 273 A.D. 131, 76 N.Y.S.2d 403 (3d Dep't 1948).

Churchill argues, however, that the contact person within a given company, as well as the product, pricing and volume information about that company, constitute confidential information. *See* T. at 149. Several cases have held that such information may be considered confidential in nature and subject to trade secret protection. *See Business Intelligence Services, Inc. v. Hudson,* 580 F.Supp. 1068, 1072 (S.D.N.Y. 1984) ("Client information, such as data on the types of hardware and software ordered by specific clients, lists of products sold to clients but not yet developed and problems arising in the course of client relations, are also protectible as a trade secret."); *Giffords Oil Co., Inc. v. Wild,* 106 A.D.2d 610, 483 N.Y.S.2d 104, 106 (2d Dep't 1984) ("[I]nformation, such as fuel oil capacity of customers' tanks, and the amount certain customers are willing to pay, which aid plaintiffs in establishing prices and which could only be achieved through personal solicitation" is confidential.); *Greenwich Mills v. Barrie House Coffee Co.,* 91 A.D.2d 398, 459 N.Y.S.2d 454, 459 (2d Dep't 1983) (court denied defendants' motion for summary judgment because they had access to "confidential information concerning various customers' preferences for particular, precise blends of coffee and the prices those customers were willing to pay for those blends. We cannot say, as a matter of law, that if that allegation is proven at trial, it would be insufficient to constitute a meaningful trade secret."); *David Fox & Sons, Inc. v. King Poultry Co.,* 47 Misc.2d 672, 262 N.Y. S.2d 983, 987 (Sup.Ct.N.Y.Co.1964) ("While we may not say that the customers for poultry products constitute a secret, ... information [about] ... the peculiar needs of plaintiffs' customers, and precise merchandise, markup, etc., was derived from the intimate knowledge of plaintiffs' business by the two former employees."), *aff'd without opinion,* 23 A.D.2d 966, 259 N.Y. S.2d 1012 (1st Dep't 1965).

The court in *David Fox & Sons, Inc.* went on to state:

It has been well established that an employee who has had entrusted to him confidential information pertaining to the conduct and clientele of his employer's business *which he would not have obtained were it not for his status as a trusted employee,* and which affords him an advantage over competitors to whom the information is not available, may not subsequently use that information to further his own ends.

*Id.* at 987 (citations omitted) (emphasis added).

Thus, it would appear that Churchill has demonstrated, at the very least, sufficiently serious questions going to the merits of its claims regarding confidential customer lists and customer information to make them fair ground for litigation. However, other considerations as well compel the conclusion that the restrictive covenant should be enforced, at least to a limited degree. First, Roter testified that Demyanovich was instrumental in developing the policy of requiring Churchill employees to sign a confidentiality agreement/restrictive covenant. T. at 75–76, 77. Demyanovich denied this at the hearing. However, in 1986, he submitted an affidavit opposing the relief sought by Marone in his action to have the restrictive covenant he had signed

declared unenforceable. In that affidavit, Demyanovich acknowledged the following:

> Churchill's customer lists are one of its most important assets and the identity of its customers is strictly confidential. Information as to which customers and which individuals within the customer's employ regularly order large batches of mailgram messages, were developed over 15 years of hard work and time-consuming canvassing and soliciting. These customers are not readily ascertainable at advertised locations; we ferreted them out over the years, sold them on electronic mail as an alternative to courier service or regular mail, and developed a close business relationship with them. The existence of these customers is only known by a limited number of Churchill employees who have access to Churchill's data base which contains these names. Within the corporation, the only people permitted access to these names are those with a need to know, principally the executives and salespeople who service these customers on a day-to-day basis.

Plaintiff's Ex. 28 at ¶ 5.

At the hearing, Demyanovich claimed not to have read the affidavit, which he said had been prepared by Churchill's attorney. T. at 90, 128–29. However, the inconsistencies between Demyanovich's statements in his affidavit and his testimony at the hearing compel the Court "to give little credance to [the] version of . . . events" proffered by him at the hearing. *See McKay*, 581 F.Supp. at 810. It is clear that restrictions considered reasonable by Demyanovich when he was in the position of safeguarding the commercial interests of Churchill have become unreasonable solely because he now seeks to compete directly with his former employer, despite his previous agreement not to do so.

In at least one case, a court has found that an admission by a former employee, in an affidavit concerning the confidential nature of information relating to his former employer's customers, was a relevant consideration in determining whether that information was entitled to trade secret protection. *See Giffords Oil Co.*, 483 N.Y. S.2d at 106.

Further support for the views expressed by Demyanovich in his affidavit can be found in his testimony regarding negotiations with Roter about the possibility of CEL's establishing a business relationship with Churchill. The proposed agreement submitted by Demyanovich to Roter contains a number of references to the restrictive covenant and stresses that the proposed agreement "[ought] not to limit [CEL's] geographic selling areas, with the exception of New York, Connecticut, New Jersey, Pennsylvania, Virginia, Maryland and Washington D.C. The above states are prohibited under the terms of my confidentiality agreement with Churchill Communications." Plaintiff's Ex. 35 at 2. Demyanovich testified that, at the time it appeared the proposed CEL–Churchill agreement might come to fruition, he was "prepared to live with the confidentiality agreement." T. at 186.

An additional consideration justifying injunctive relief, which is equitable in nature and unrelated to the existence of a restrictive covenant, comes into play where there is evidence that a former employee has "pursued a particular course of conduct with the intention of injuring or destroying his former employer's business." *See* Annotation, *Former Employee's Duty, In Absence Of Express Contract, Not To Solicit Former Employer's Customers Or Otherwise Use His Knowledge Of Customer Lists Acquired In Earlier Employment*, 28 A.L.R.3d 7, 112, at § 22[a] (1969) ["Annotation"]; *see also People's Coat, Apron & Towel Supply Co. v. Light*, 171 A.D. 671, 157 N.Y.S. 15, *aff'd*, 224 N.Y. 727, 121 N.E. 886 (1916); *Duane Jones Co. v. Burke*, 306 N.Y. 172, 117 N.E.2d 237 (1954). Demyanovich's longtime former secretary testified that he told her he intended to actively solicit Churchill's customers for CEL's benefit and "intended to see Roter destroyed." T. at 210.

 Given the possibility that the customer information taken by Demyanovich may ultimately prove to be confidential in nature, the fact that various customer lists,

along with other business records and material belonging to Churchill, were found in Demyanovich's possession long after he had left its employ, the fact that in an affidavit and in a proposed agreement between CEL and Churchill, Demyanovich acknowledged that Churchill's customer information is confidential in nature, and the fact that Demyanovich admitted at the hearing that the lists and other information in his possession would be very useful to an individual seeking to compete with Churchill, T. at 137, Churchill has demonstrated, at the very least, sufficiently serious questions going to the merits of its claims to make them a fair ground for litigation.

Certainly, the fact that Demyanovich had in his possession detailed customer information and business records belonging to Churchill months after leaving its employ raises a substantial issue of whether he breached a duty of loyalty. It is undisputed that Demyanovich took many of the items months prior to his departure in March 1987. It is also undisputed that (1) CEL was formed in January 1987, while Demyanovich was still employed by Churchill, T. at 165; (2) Demyanovich placed advertisements in several national newspapers seeking salespeople for CEL and then charged Churchill for the cost of these advertisements, T. at 182; and that (3) Demyanovich used Churchill messangers to pick up the responses and sent mailgrams out to those who had answered, all at Churchill's expense. T. at 182. He also had in his possession copies of forms filled out by Churchill salespeople regarding prospective customers. Plaintiff's Ex. 23 These forms contained the name of a contact person, along with the estimated needs of the organization and the prices they were willing to pay. These and the other items in evidence were all taken by Demyanovich while he was still in Churchill's employ. It seems clear that

> surreptitious removal, copying, or withholding of an employer's customer lists or information for later competitive purposes breaches the obligation of loyalty owed by an employee to his employer, and entitles the employer to relief

against subsequent use of such information by the faithless ex-employee, regardless of the manner in which the information was originally compiled.

Annotation § 14[a], at 63.

## B. IRREPARABLE HARM AND THE BALANCE OF HARDSHIPS

The last obstacles to the issuance of a preliminary injunction are a requisite showing of irreparable harm and a balance of hardships tipping decidedly in favor of the party seeking the relief. Although Churchill failed to prove that any of its customers had already gone over to CEL for its electronic message processing needs, actual harm is not required in establishing the potential for irreparable injury. Without injunctive relief, Demyanovich could conceivably begin widespread solicitation of new customers by first targeting Churchill's 2000–odd customers. Demyanovich admits that CEL has already solicited a number of Churchill customers with whom he, Marone or Czuczak had contact while in Churchill's employ. T. at 160–64. With the knowledge he possesses regarding these customers' electronic mail volume and product requirements, as well as the price structures that had been worked out between them and Churchill, CEL could easily undercut Churchill in price and steadily deplete its entire customer base. Such a possibility is sufficient to establish that, absent injunctive relief, Churchill stands to suffer irreparable harm. *See J.H. Goldberg Co., Inc. v. Stern,* 53 A.D.2d 246, 385 N.Y.S.2d 427, 431 (4th Dep't 1976); *Service Systems Corp. v. Harris,* 41 A.D.2d 20, 23–24, 341 N.Y.S.2d 702, 706 (4th Dep't 1973) ("An employer has sufficient interest in retaining present customers to support an employee covenant where the employee's relationship with the customers is such that there is a substantial risk that the employee may be able to divert all or part of the business."); *David Fox & Sons, Inc.,* 262 N.Y.S.2d at 986–87.

Regarding the balance of hardships, Demyanovich testified that approximately 65 percent of CEL's business is in direct mail processing, an area that would not be af-

fected by the preliminary relief requested, with the remaining 35 percent comprised of electronic message processing and video communications. In contrast, virtually all of Churchill's business is in electronic message processing. Thus, an injunction will have the effect of restricting a limited portion of CEL's business, *i.e.*, solicitation of Churchill customers, while leaving CEL free to solicit non-Churchill customers and to pursue the direct mail processing which comprises the majority of its business. On the other hand, Churchill faces the possible loss of virtually its entire business because it is primarily engaged in electronic message processing. Because CEL will only be enjoined from soliciting Churchill customers and will be allowed to compete generally with Churchill for new customers, CEL will be "free to fairly conduct the business of selling [electronic mail products] in the same manner as did [Churchill] in building up its operation." Annotation § 16[a], at 78.

## CONCLUSION

For all of the foregoing reasons, Robert Demyanovich and CEL Industries, Inc., its officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them who receive actual notice of this Order, are enjoined from soliciting, either directly, or indirectly, any active customer of Churchill as of March 15, 1987. Within two weeks of the issuance of this Memorandum and Order, counsel for Churchill is directed to deliver to counsel for Demyanovich and CEL a customer list containing the name, address, department and contact person for each customer. Counsel for the parties are directed to submit a proposed protective order, if deemed necessary. In addition, Demyanovich is directed to return forthwith any property, customer list or business record belonging to Churchill still in his possession. Churchill shall post bond in the amount of $100,000. Fed.R.Civ.P. 65(c), (d).

SO ORDERED.

## APPENDIX

## AGREEMENT

AGREEMENT made this 26th day of August, 1986, between CHURCHILL COMMUNICATIONS CORP., a New York corporation having its principal offices at 500 Eighth Avenue, New York, N.Y. 10018, and its subsidiaries and affiliates (hereinafter collectively referred to as the "Company"), as EMPLOYER, and Robert P. Demyanovich as EMPLOYEE.

In consideration of my employment by the Company and for value received, I agree with the Company as follows:

1. I agree that all information concerning the Company and its business developed by me or acquired by me from others during the course of my employment, except information which is or becomes generally available to the public, shall be the exclusive property of the Company and will not be disclosed by me to any person except in connection with the performance of my authorized duties or as otherwise expressly authorized by the Company. Such information shall include but not be limited to: product and service designs, business plans, marketing plans, financial data, customer lists, programs, systems, formats, screen designs and input and output specifications, inclusive of documentation.

2. I agree on behalf of myself, my heirs and representatives that I will promptly communicate, disclose and transfer to the Company, free of encumbrance and restriction, the following: (a) all inventions and other improvements originated or developed by me solely or jointly with others during my working hours or at the Company's expense or on the Company's premises or using the Company's resources, and (b) all inventions or improvements relating to the Company's business, originated or developed by me solely or jointly with others during the term of my employment. These inventions and improvements shall belong to the Company whether or not patent applications are filed thereon. Each such transfer shall include all patent rights to such inventions or improvements in this and all foreign countries.

3. I recognize that my employment with the Company affords me close contact with the Company's customers and suppliers, which contacts are of great importance to the Company's business. Therefore, in consideration of my being employed with the Company, I agree that, so long as I am employed by the Company and for a period of two (2) years thereafter, I will not, directly or indirectly, individually or as a principal, stockholder, director, partner, employee, officer, agent or consultant, engage in any business which is competitive with the electronic message processing business of the Company in geographic areas in which such business is conducted by the Company.

4. I recognize that my employment also affords me knowledge about the Company's operations which would enable me to unfairly interfere with its business should I leave the Company's employ. Therefore, in consideration of my being employed by the Company, I agree not to now, or in the future, disrupt, damage, impair or interfere with the business of the Company in any way, including, but not limited to, interfering with or raiding its employees.

5. I undwerstand that this agreement will remain in full force and effect following termination of my employment for any reason.

6. I understand that in the event of a breach or threatened breach of any of the covenants contained in this agreement, the Company may not have an adequate remedy at law and the Company shall therefore be entitled to obtain injunctive relief, in addition to any other remedies it may have.

7. I recognize that this agreement constitutes the entire understanding between the parties with respect to its subject matter and cannot be altered or amended except by a signed written instrument.

8. I understand that this agreement shall be governed by and construed according to the laws of the State of New York and that any litigation arising out of this agreement shall be brought in the Supreme Court of the State of New York, or the United States District Court for the Southern District of New York.

(s) Robert P. Demyanovich
Robert P. Demyanovich, Employee
CHURCHILL COMMUNICATIONS CORP.
By (s) Mark Roter
Employer