PANTHER SYSTEMS II, LTD., Panther Systems, Ltd., Computers Anonymous, Lloyd A. Groveman, Plaintiffs,

v.

PANTHER COMPUTER SYSTEMS, INC., Randy Schleger, Jay Schleger, Stanley Schleger, Stanley Schleger, CPA's, Defendants.

Randy SCHLEGER and Panther Computer Systems, Inc., Counterclaim Plaintiffs,

v.

Lloyd A. GROVEMAN and Panther Systems II, Ltd., Counterclaim Defendants.

No. CV 91–1478 (ADS).

United States District Court, E.D. New York.

Nov. 29, 1991.

Kenyon & Kenyon (Philippe Bennett, Richard L. Hahn, of counsel), and Evan Katz, New York City, for plaintiffs.

Kase & Druker (James O. Druker, Paula Schwartz Frome, of counsel), Garden City, N.Y., for defendants.

## ORDER

SPATT, District Judge.

This matter was referred to United States Magistrate Judge Michael L. Orenstein pursuant to 28 U.S.C. § 636, Fed. R.Civ.P. 72(a) and Rule 1 of the Magistrate's Rules for the Eastern District of New York, to hear and prepare a Report and Recommendation with regard to the plaintiffs' motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a). On November 6, 1991, Magistrate Judge Orenstein rendered his Report, recommending the following:

1. that the New York Telephone Company place a recorded message on telephone number (516) 466–6108 which will indicate to callers where they can contact plaintiffs and defendants and that in all other respects the telephone number should be discontinued;

2. that as consented to by the parties, the defendants, their officers, agents and employees and all persons in active con-

cert or participating with them, be enjoined from using the Panther trademark and logo and the Panther Systems tradename or any other similar trademark, name or logo or using any copyrighted sales literature of the plaintiffs;

3. that the defendants and their employees, agents or representatives be enjoined from (a) using or passing off as their own any office sign, labels, business card, stationery, promotional literature, business form, containers, name or other indicia or insignia similar or deceptively similar to any used or formerly used by plaintiffs; (b) stating or imitating that Defendants' computer hardware and software or any other goods are manufactured, sold or warranted by plaintiffs; and (c) using published reviews of plaintiffs' products;

4. that the defendants be directed to return to the plaintiffs any mail addressed to plaintiffs, computer hardware or software, business and financial records, customer lists or any other internal record used by Panther Systems Ltd.;

5. that the defendants be enjoined from dissipating, concealing, altering, diverting, destroying, mutilating, taking into custody, or disposing of, in any manner or using or copying all or any portion of such documents;

6. that the defendants be enjoined from doing business, on behalf of any entity involved in the computer business, with Eaton Corporation or Telephonics Corporation, plaintiff Groveman's prior employer, or any other private customer of plaintiffs as of January 19, 1991, or private entity whose identity was learned by defendants or agents or employees of defendants during the course of association with plaintiffs or from customer lists of plaintiffs or from inquiries directed to plaintiffs;

7. that the defendants, their officers, agents and employees and all persons in active concertor participating with them be enjoined from (a) soliciting and collecting from customers of plaintiffs any payment of monies due plaintiffs; (b) soliciting, collecting and taking custody over material assets belonging to plaintiffs being held by third parties; and (c) return and turn over to plaintiffs all records of bank accounts, deposits, withdrawal slips and the monies held in the name of Panther Systems Ltd., Panther Systems II, Ltd. or Computers Anonymous;

8. that the defendants not be enjoined from doing business with any public or quasi-public customer of Panther System's Ltd. which they obtained through a public bid;

9. that the defendants' knowledge of plaintiffs' suppliers, in addition to their possession of a supplier list, if any, is not protectable as a trade secret. Accordingly, defendants may solicit orders from plaintiffs' suppliers as Light–Speed Systems Ltd. provided that they do not use the Panther tradename, trademark, logo, any Panther promotional material or indicate their prior connection to any Panther entity.

On November 20, 1991, the defendants Panther Computer Systems, Inc., Randy Schleger, Jay Schleger, Stanley Schleger, Stanley Schleger, C.P.A., timely filed objections to the Report and Recommendation. On November 22, 1991, the plaintiffs Panther Systems II, Ltd., Panther Systems, Ltd., Computers Anonymous, and Lloyd A. Groveman timely filed objections to the Report and Recommendation.

The Court having fully considered the Report and Recommendation as well as the objections to the Report and Recommendation, and having undertaken a *de novo* review of the matter (*see* 28 U.S.C. § 636[b][1]; *Grassia v. Scully*, 892 F.2d 16, 19 [2d Cir.1989] ), it is hereby

ORDERED, that the Report and Recommendation of United States Magistrate Judge Michael L. Orenstein, dated November 6, 1991, is confirmed and adopted by this Court in all respects; and it is further

ORDERED, that the plaintiffs' motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a) is granted to the extent set forth above; and it is further

ORDERED, that the plaintiffs post an undertaking, pursuant to Fed.R.Civ.P. 65(c)

in the amount of $25,000.00 within five (5) days of the date this order to secure the preliminary injunction.

SO ORDERED.

## REPORT

MICHAEL L. ORENSTEIN, United States Magistrate Judge.

Plaintiffs seeks to enjoin defendants from further infringing plaintiffs trademarks, tradename and copyrights. In addition, plaintiffs seek to enjoin defendants from misappropriating certain proprietary information belonging to plaintiffs', including lists of current and potential customers, information regarding those customer's past, present and future computer needs, pricing strategies and names of contacts at these companies and names of plaintiffs' suppliers.

## PROCEDURAL POSTURE

On March 19, 1991, Panther Systems Ltd. and Randy Schleger, as plaintiffs obtained at Nassau County Supreme Court an *ex parte* temporary restraining order enjoining, Lloyd Groveman, from wasting or converting the assets or diverting the corporate opportunities of Panther Systems Ltd. Thereafter, a preliminary injunction was denied and the state action was dismissed with prejudice without opposition. Lloyd Groveman then moved for a determination that the state action was frivolous and without merit and for an award of attorney's fees and costs. In granting the motion, the state court found that "[t]here has never been one scintilla of evidence presented to show [Randy Schleger] was ever a shareholder in Panther Systems, Inc.[1] [sic]" *Panther Systems Ltd. v. Groveman*, Index No. 5770/91 (Nassau Sup.Ct. June 4, 1991). The state court awarded $10,000 for costs and attorney's fees.

Thereafter, Panther Systems II, Ltd., Panther Systems Ltd., Computer Anonymous and Lloyd Groveman, the plaintiffs herein, filed suit in federal court for trademark infringement (15 U.S.C. § 1051 *et seq.*) and copyright infringement (17 U.S.C. § 101 *et seq.*), and dilution of the trademark (N.Y.Gen. Bus. § 368–d [McKinney 1991]), deception (N.Y.Gen. Bus. § 133 [McKinney 1991]) and common law unfair competition under New York State law. On August 27, 1991, plaintiffs moved for a preliminary injunction enjoining defendants from further infringement of plaintiff's trademark and logo, tradename and copyrights. The case was referred to the undersigned for a report and recommendation on the motion for a preliminary injunction. Based upon the discussion below, the court recommends that plaintiffs' application for a preliminary injunction be granted to a limited extent.

## BACKGROUND

### Introduction

Plaintiff, Panther Systems Ltd., incorporated in October 1989, was located at 74 Hickory Lane in Roslyn Heights, New York.[2] Panther Systems Ltd. sold computer hardware and software. The sole incorporator of Panther Systems Ltd. was plaintiff Lloyd Groveman.[3] Prior to incorporating Panther Systems Ltd., Groveman from July 1986 through May 1989 worked at Eaton Corp. (now Telephonics Corp.), as a software engineer. Thereafter, he founded Panther Systems Ltd.

In April 1990, defendant, Randy Schleger became associated with Panther Systems Ltd. Randy Schleger, through his association with the business, learned the day-to-day operations of Panther Systems Ltd. Shortly after Groveman and Randy Schleger became associated, Panther Systems Ltd. moved into the accounting offices of

---

1. Instead of "Panther Systems Inc.", the state court order should have read "Panther Systems Ltd."

2. Panther Systems Ltd. has subsequently been dissolved. It has been reincorporated as Panther Systems II, Ltd.

3. The plaintiff, Computers Anonymous, was a company Lloyd Groveman formed while in high school. He was its president from 1981 to 1987. Computers Anonymous also sold computer hardware and software.

Stanley Schleger, Randy Schleger's father. This office provided desk space to Panther Systems Ltd. and was used as a mail drop and for a place to receive phone calls.

Lloyd Groveman contends that his relationship with Randy Schleger was based on Stanley Schleger's intention to invest three hundred thousand dollars in Panther Systems Ltd. Groveman states that upon tender of such monies he would convey fifty percent of his shares of Panther Systems Ltd. to Randy Schleger. On this basis, plaintiffs allege that confidential information was made available to Randy Schleger in anticipation of the three hundred thousand dollar investment by Stanley Schleger. However, the alleged three hundred thousand dollar investment never materialized.

The defendant, Randy Schleger states that he joined forces with Lloyd Groveman "to build a computer business." *Schleger's Federal Affidavit*, at p. 4. He states that neither he nor his father ever discussed investing three hundred thousand dollars in Panther. *Schleger's Federal Affidavit*, at p. 5. In fact, Schleger claims that he and Groveman agreed to be equal partners in Panther Systems, Ltd. and that the name of Panther was to be built up through "sweat equity." *Schleger's Federal Affidavit*, at p. 4. According to Randy Schleger, he never "received a dime" as either commission or salary. *Schleger's Federal Affidavit*, at p. 9. Randy Schleger states that his function in Panther Systems Ltd. was that of a "salesman." *Schleger's Federal Affidavit*, at p. 2. Prior to his association with Lloyd Groveman, Randy Schleger had never been affiliated with a computer company.

Groveman and Randy Schleger solicited the help of Stanley Schleger, a certified public accountant, in running part of the business. While both sides disagree as to how and why Stanley Schleger became involved in the business, it is uncontested that between April and December 1990, Stanley Schleger performed many functions for Panther Systems Ltd. According to Groveman, in September 1990, Stanley Schleger asked to hold all of Panther Systems Ltd.'s bank and financial records. Groveman admits to obliging this request. Stanley Schleger, at that point, was also given responsibility for filing Panther Systems' tax returns. Groveman claims that he requested return of these documents numerous times after the "falling out" between himself and Randy Schleger, but they were not returned to him until July 1991, approximately six months after the "falling out" and three months after the filing of the federal complaint. Further, Groveman contends that the Schlegers still have not yet returned Panther Systems Ltd.'s business records.

Both sides agree that Stanley Schleger represented that he was President of Panther Systems Ltd. to the Nassau Regional Off–Track Betting Corporation ("OTB") and both sides confirm that he held no such position. While Groveman maintains this representation was done without his authorization, Randy Schleger contends that it was done at the express direction of Lloyd Groveman to give the appearance of experience to a business run by two "kids."

According to Randy Schleger, his father urged him to enter into a written agreement with Lloyd Groveman and to get possession of stock certificates of the company. Groveman confirms this and contends that he was even asked to sign a partnership agreement handwritten by Stanley Groveman. The partnership agreement allegedly stated that "Lloyd Groveman and Randy Schleger will be equal partners in Panther Systems, Ltd." *Groveman Affidavit*, at p. 15. However, this partnership agreement was never executed by Lloyd Groveman. In early December, Groveman contends he informed Randy Schleger that he was withdrawing his offer to sell him stock and that he could "no longer be associated with Panther Systems, Ltd." *Groveman Affidavit*, at p. 16.

*Alleged Bad Acts*

In early January, Groveman received statements from American Express indicating that Randy Schleger had charged items to Panther Systems' corporate account. Groveman contends that he never authorized Randy Schleger to have such a credit

card. The charges all reflected restaurant bills. On the other hand, Randy Schleger claims that it was at Groveman's suggestion that he get an American Express card.

According to Groveman, on January 19, 1991, Jay Schleger, Randy's brother, telephoned him and demanded possession of all the business records concerning Panther Systems Ltd, all the accounts receivable and that if he didn't comply he "will be beaten and killed." *Groveman Affidavit*, at p. 18. Jay Schleger stated that "he would come to my apartment, or would find me wherever I am." *Groveman Affidavit*, at p. 18. On the basis of these threats, a criminal proceeding was initiated in Nassau County. Groveman during this telephone call allegedly told Jay Schleger that Randy was "to have nothing to do with Panther Systems." *Groveman Affidavit*, at p. 18. Randy Schleger denies any awareness of this telephone call. Interestingly, the court has not been provided with any affidavits of Messrs. Jay and Stanley Schleger indicating the same.

After this telephone call, Groveman contends that

> [o]ver the course of the next few days, I was, nevertheless, informed by clients of Panther Systems that Mr. Randy Schleger: had driven to see those clients; had represented to them that he was still affiliated with Panther Systems; and had taken into his personal custody PANTHER computers which belonged to Panther Systems, Ltd. (These computers were demonstration units which were lent to those companies by Panther Systems.) In addition, I was told by Panther Systems' clients that Mr. Schleger had also taken into his possession, from those clients, accounts receivable due Panther Systems.... Mr. Schleger's actions, and representations to customers of Panther Systems, were entirely unauthorized, and his collection of computer equipment and accounts receivable were thefts from Panther Systems.

*Groveman Affidavit*, at p. 19 [capitalization in the original]. Thereafter, on January 23, 1991, Groveman dissolved Panther Systems Ltd. and reincorporated it on Jan-

uary 24, 1991, as Panther Systems II, Ltd. ("Panther II"). Randy Schleger was not a party to this reorganization.

On January 16, 1991, defendants incorporated Panther Computer Systems Inc. to allegedly compete with plaintiff's Panther entities. This was three days before the threatening phone call to Groveman and five days before Panther Systems Ltd. wrote to vendors and customers stating that Randy Schleger had been dismissed.

In late January, according to Groveman, he was informed by one of Panther Computer Systems Ltd.'s suppliers that Randy Schleger had represented to it that he was an "agent of Panther Systems; and had taken into his personal custody 12 computers, which he had charged to Panther Systems' account." *Groveman Affidavit*, at p. 21. However, Schleger claims that it was Panther Computer Systems, Inc., the entity incorporated by his brother, which paid for the computers. *Schleger's Federal Affidavit*, at p. 14.

Another example of Schleger's bad faith, according to Groveman, is evidenced by *PC Magazine* informing him that Randy Schleger had told "its personnel that he, Randy Schleger, was the owner and incorporator of Panther Systems, Ltd." *Groveman Affidavit*, at p. 21. Thus, on this basis, on January 21, 1991, Groveman contacted Panther Systems Ltd.'s vendors and clients and informed them that "Randy Schleger had been dismissed from Panther Systems, Ltd. and was no longer affiliated with Panther Systems ... and that all correspondence should be sent directly to the Panther Systems' headquarters in Roslyn Heights." *Groveman Affidavit*, at p. 19.

Thereafter, Groveman attempted to disconnect the local telephone number of Panther Systems Ltd. He was unsuccessful, however, since the telephone number was subscribed to Stanley Schleger's name. While the facts establish that Panther Systems Ltd. had a telephone line at Stanley Schleger's office, Randy Schleger's inconsistent sworn statements regarding installation of the phone line are indicative of his bad faith. In the state proceeding, Schleger stated in his affidavit that "[w]e ar-

ranged with the phone company for a local phone service for the business as well as a special '800' toll free line which was installed at our offices at 111 Great Neck Road, Great Neck, New York." *Schleger's State Affidavit,* at p. 3. However, in the federal proceedings, Schleger states that "it was at our request that ... the telephone number (which is one of my father's accounting firm's telephone lines) [be installed], so that we would be able to save money." *Schleger's Federal Affidavit,* at p. 5. Defendant's sworn statement in state court while not completely inconsistent with his position in the instant proceedings, does not reflect the reality of how the phone line was actually installed. In reality, the line was installed under Stanley Schleger's name.

Thereafter, Groveman filed a change of address notice with the Great Neck Post Office. However, on February 14, 1991, Stanley Schleger, as the accountant for Panther Systems Ltd., wrote to the postmaster and stated that

> the offices of the Corporation have always been located at 111 Great Neck Road ... I insist that the mail be forwarded to us immediately.... I realize that a disgruntled employee has cost us numerous problems to date.

*Exhibit O to Groveman Affidavit.* This letter was placed on the letterhead of Stanley Schleger & Company. This letterhead indicates that Stanley Schleger & Company is located at the same address as Panther Systems Ltd. The fact that Stanley Schleger characterized Lloyd Groveman as a mere "employee" is extraordinary. Moreover, this letter having been written by the alleged "accountant" of the corporation, almost *three weeks* after Panther Systems Ltd. was dissolved, is incredible in light of the statement that the "[c]orporation has always been located at 111 Great Neck Road" and the fact that Stanley

Schleger and Panther Systems Ltd. shared the same offices. In addition, the enclosure of the filing receipt for the incorporation of Panther Computer Systems Inc., Jay Schleger's entity, in support of his request to the postmaster, is a flagrant misrepresentation. *Groveman Affidavit,* at p. 25. As a result of this letter, Groveman contends that Stanley Schleger successfully convinced the postmaster to forward the Panther Systems Ltd.'s mail to the Great Neck address and thus he lost receipts of over twelve thousand dollars which he allegedly has yet to recover. *Groveman Affidavit,* at p. 25.

Moreover, in February 1991, according to Groveman, OTB purchased from Panther II over seven thousand dollars of computers and peripherals. The check, however, was erroneously made out to Panther Systems Ltd. and mailed to the Great Neck address. Thereafter, Groveman learned that the check had been cashed by Randy Schleger against Panther Systems Ltd.'s account and applied toward a personal loan of Mr. Schleger's. *Groveman Affidavit,* at p. 23. Schleger contends this was proper in that the loan was taken out on behalf of Panther Systems. *Federal Schleger Affidavit,* at p. 15.

According to Groveman, in March of 1991, *PC Magazine* was telephoned by someone claiming to be Lloyd Groveman and requested that a computer sent to them for evaluation by Panther Systems Ltd. be returned to the Great Neck address. Schleger contends that such act was authorized pursuant to an alleged agreement [4] between himself and Groveman. *Federal Schleger Affidavit,* at p. 16. Specifically, he contends that the proceeds of the sale of this computer were to be used to pay off Schleger's loan and to pay suppliers of Panther Systems Ltd. *Federal Schleger Affidavit,* at p. 16. Similarly,

---

**4.** While a settlement of the entire dispute between the Schlegers and Groveman was attempted on February 5, 1991, the affidavit of Martin Cohen, an employee of Stanley Schleger, supports the conclusion that no agreement was ever reached. He states that

> [t]he issues which remained open at the end of the [settlement] meeting were the status of

the OTB account, which was Panther's biggest account, and the status of the "Panther" name. There was no resolution of the OTB issue, but my understanding about the name was that both sides insisted [that] they were going to use it until the matter was completely settled. *Cohen Affidavit* at p. 4.

a Panther Systems, Ltd. computer loaned to *Computer Shopper* for reviewing was also diverted by Randy Schleger to Panther Computer Systems, Inc. Randy Schleger does not contest this allegation.

As evidence of defendants' further misrepresentation of plaintiffs' name, Groveman contends that they used the Panther Systems Ltd. name to secure an bid award from the Smithtown Central School District. While defendants supposedly bid on the public contract as Panther Computer Systems, Inc., the award of the bid was received by Groveman. In addition, while defendants used the name of their new entity, "Panther Computer Systems Inc." in the listing on the bid proposal, the court notes that according to the papers submitted by plaintiffs the sales material accompanying the bid named the Groveman entity, "Panther Systems Ltd.," as the vendor. *Exhibits V and W to Groveman's Affidavit.* Interestingly, Smithtown Central School District filled out a purchase order reflecting the vendor as "Panther Systems" and not "Panther Computer Systems." *Exhibit T to Groveman's Affidavit.*

In March, Randy Schleger delivered twelve computers to BOCES, a client of Panther Systems Ltd. Groveman states that Schleger

> misrepresented to BOCES that he was an agent of Panther Systems; and had told the client that it should convey payments only to himself, Randy Schleger, personally, Mr. Schleger later stated to BOCES that he was authorized to receive payment on behalf of Panther Systems, took possession of a check made payable to Panther Systems (in the amount of $5,964.00), and cashed that check.

*Groveman Affidavit,* at p. 24. Schleger admits to delivering "the computers to BOCES, fulfilling the order that had been given to Panther, and that [he] received the check." *Schleger's Federal Affidavit,* at p. 16. Schleger contends that he used the money to pay the "supplier of those very computers, because Lloyd had not done so." *Schleger's Federal Affidavit,* at p. 16.

Groveman contends that in March, Randy Schleger charged to the Panther Systems Ltd. account at Tech Data certain computer supplies. The supplies, however, were then sent to Randy Schleger's residence in Kings Point. According to Groveman, Randy Schleger also tried to unsuccessfully change the address and telephone number for Panther Systems Ltd.'s account at Tech Data to that of the Schlegers' Kings Point residence. In addition, Groveman states that he was informed by Tech Data on July 22, 1991 that Randy "Schleger had represented to Tech Data that he was affiliated with Panther Systems, and that Mr. Schleger had requested that Tech data forward to him Tech data's file of credit and financial information on Panther Systems." *Groveman Affidavit,* at p. 33. Thereafter, Tech Data called Groveman to check whether there was proper authorization to give out such confidential and proprietary information. *Groveman Affidavit,* at p. 33. Not surprisingly, Groveman states that he gave no such authorization. Schleger's response in his affidavit is nonresponsive and incriminating. Specifically he states that:

> I telephoned Tech Data to ask them for some forms, on which I believed that I had been listed as Vice President. I did *not* ask for Panther's credit information, and had no intent to tamper with Panther's credit. I simply sought some information for use in this litigation.

*Schleger's Federal Affidavit,* at p. 19 [emphasize in the original].

Groveman contends that he received a letter from the University of Kentucky addressed to "Randy Schleger, President, Panther Systems" and that a call made by the University to Panther Systems Ltd. telephone resulted in a response from that number stating that "Randy Schleger, is the President of Panther Systems." *Groveman Affidavit,* at p. 34. Randy Schleger contends that he had no idea how this letter came about and that the staff at his father's office have been instructed to give out no information except that Panther is no longer at that telephone number. *Schleger's Federal Affidavit,* at p. 19.

Schleger asserts that "I *never* misrepresented my status with Panther. I was, at all times, still affiliated with the company, and Lloyd left it." *Federal Schleger Affidavit*, at p. 16 [emphasis in the original]. Schleger contends that the corporation Panther Computer Systems Inc., incorporated by his brother Jay, is simply the successor corporation to Panther Systems Ltd. *Schleger's Federal Affidavit*, at p. 16; *see Exhibit O to Groveman Affidavit.*

Perhaps, the most egregious, and uncontested allegation is that Randy Schleger tampered with one of Groveman's vendors. In April, 1991, plaintiffs were notified by a vendor of Computers Anonymous that Randy Schleger had instructed that vendor to change the mailing address and telephone number for Computers Anonymous to the address of Schleger's Kings Point address. Computers Anonymous is Groveman's original firm. Such an allegation is beyond amazement given the fact that Schleger has never asserted in either the state or federal proceedings to have any rights or interest in Computers Anonymous. According to Groveman, as a result of this telephone call by Randy Schleger, the vendor "shipped to the Schleger residence computer equipment, all of which was charged to Computers Anonymous' account." *Groveman Affidavit*, at p. 29. Furthermore, Randy Schleger "attempted to have refund checks on Computers Anonymous' account likewise sent to his residence in Kings Point." *Groveman Affidavit*, at p. 29.

Plaintiffs contend that in late March, 1991, Randy Schleger opened a bank account in the name of Panther Systems Ltd. without Groveman's authorization. Randy Schleger admits that he opened the account, but claims that he was going to use it "to hold all amounts made by Panther Systems, so that, when the time came for the matter to be settled between me and Lloyd, I would be able to account for all the amounts I made. This would facilitate a division of the business." *Schleger's Federal Affidavit*, at p. 17. This answer is both nonresponsive to Groveman' claim and is an improper act given his association with Panther Systems Ltd.

Plaintiffs' affidavit is replete with uncontested allegations that defendants represented themselves as being associated with Panther Systems Ltd., removed without authorization plaintiffs' computers, cashed plaintiffs' accounts receivable without permission and tampered with their suppliers. Simply stated, defendant, Randy Schleger, contends he was authorized to do such acts because he had an equity interest in Panther Systems Ltd. and thus had a right to do business under its tradename, trademark and trade dress. The undisputed facts do not bear this out.

Moreover, defendants' bad faith is evidenced by their answers to plaintiffs interrogatories. For example, plaintiffs in Interrogatory No. 14 ask defendants to

> [i]dentify each type of good or service relating to computers, or other electronic apparatus, which is made, sold, or offered for sale by Defendants using trademarks other than any of [Plaintiffs'] marks, what trademarks were used, and the general or common name or term used to denote the product or service.

Defendants answered on September 5, 1991, "None" and on September 26, 1991 stated that "Randy Schleger offers computer hardware for sale under the trademark Lightspeed Computers." Defendants' statement is inconsistent with Light–Speed Systems Ltd.'s incorporation by Stanley Schleger on February 28, 1991. Moreover, the certificate of incorporation indicates that process against the corporation may be made "c/o Stanley Schleger & Company 111 Great Neck Road Great Neck, NY 10021."

Equally disturbing are defendants answers to interrogatory no. 9, where plaintiffs ask:

> (a) Has any person ever recommended or advised against the acquisition, adoption, or use of the marks by Defendants?

The answer on September 5, 1991 was "No" and on September 26, 1991 the answer was "Yes, as Panther Computer Systems, Inc.; No as to others." Defendants' responses to interrogatory no. 33 fall into the same category. There, plaintiffs asked

(a) Are Defendants aware of any instance or occasion of confusion or mistake involving the source, origin or sponsorship of goods or services sold by Defendants, their licensees, or related companies, under any of the marks?

(b) If the answer to the preceding interrogatory is other than an unqualified negative, with respect to each such instance or occasion:

(1) identify the person or persons confused or mistaken;

(2) state the dates and places of such confusion or mistake;

(3) describe the instances or occasions;

(4) state the manner in which such confusion or mistake was communicated to, or came to the attention of, Defendants, and the identity of the persons associated with Defendants aware of such communication;

(5) identify all persons having knowledge of each such instance of [sic] occasion; and

(6) identify all documents referring or relating in any way to such confusion or mistake.

Defendants answered "No" to these interrogatories on September 5, 1991 and on September 26, 1991 answered

(a) Yes, as to "Panther;" no as to Computers Anonymous.

(b)(1) Joe Bailey, as set forth above; Smithtown Central School District.

(2) Late March, 1991.

(3) Smithtown Central School assumed that a bid submitted by Panther Computer Systems, Inc. had actually been submitted by Panther Systems, Ltd.; Joe Bailey telephoned to order a motherboard from "Panther", and received a motherboard from Panther Computer Systems, Inc.

(4) Joe Bailey—on the telephone stated he wanted to purchase from "Panther;" Smithtown Central District—telephoned to inquire status of bid and learned that Panther Systems, II, Ltd. had "transferred" the bid to itself.

(5) Joe Bailey—Joe Bailey, Randy Schleger, Lloyd Groveman, employees of Smithtown Central School District

whose names and addresses are currently unknown.

(6) Re: Smithtown Central School District: See exhibits T–U to affidavit of Lloyd Groveman dated August 27, 1991; re: Jay Bailey, None.

These examples are indicative of defendants inability to truthfully answer questions.

In his defense, Randy Schleger states in his affidavit that

I am not now using the Panther name or trademark, and have not used that name or mark since approximately May, 1991. I have not represented myself to be affiliated with Panther since that time, I have not sold any products under that name, and I have no intention of doing so until my rights in that name are determined by this lawsuit.

*Schleger's Federal Affidavit,* at p. 1. However, this statement was more than three months after the "falling out" between Groveman and Schleger. Schleger further states he is not

operating any computer company which uses the trade name 'Panther' out of my father's office.... Indeed, Panther Computer Systems is no longer transacting business of any sort.

*Schleger's Federal Affidavit,* at p. 15. While this may be true as of the date of the affidavit, absent from his affidavit is any denial he did not do these acts from January 16, 1991, the date Panther Computer Systems was incorporated, until mid-May of 1991. In particular, defendants' affidavit does not contest plaintiffs' allegations that Randy Schleger misrepresented that he was somehow still affiliated with Panther Systems Ltd. and that Groveman was "no longer with the company." *Groveman Affidavit,* at pp. 24–25. Based on plaintiffs contentions and defendants often nonresponsive and contradictory answers to interrogatories and responses to plaintiffs' allegations made under oath, the court recommends that the preliminary injunction be granted in accordance with the discussion below.

## DISCUSSION

■ In order to obtain a preliminary injunction, the movant must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *see also Warner Bros. v. Gay Toys, Inc.,* 658 F.2d 76, 78–79 (2d Cir.1981) (applying *Jackson Dairy* standard to trademark infringement case).[5] Based on the above facts, this court finds there is a more than sufficient basis to enjoin defendants from certain of their activities.[6] The seriousness of the allegations, the potential breaches of defendants' fiduciary duty to Lloyd Groveman and Panther Systems Ltd., the inconsistencies of defendants responses, the evidence of actual confusion and the likelihood of intentional misconduct on part of defendants lead inescapably to the granting of a preliminary injunction. The question is the extent of the injunction.

### A. *The Panther Systems Ltd. Entity*

#### 1. Corporation

In 1989, Panther Systems Ltd. was incorporated in Delaware. The incorporator was Lloyd Groveman. The court notes that the "Certificate of Dissolution By Written Consent Of All Stockholders Entitled to Vote" (*see Exhibit XD* to *Complaint and Demand for Jury Trial*) indicates that Lloyd Groveman was the sole director and shareholder. The court is not aware of any corporate resolutions or bylaws which identify Panther Systems Ltd.'s officers or employees. Nor have defendants provided the court with any corporate documentation to establish that Randy Schleger is either a shareholder, officer or director of the corporation.

■ Randy Schleger claims that his execution of a bank account resolution makes him a shareholder of Panther Systems Ltd. While both sides admit that Randy Schleger was a signatory to Panthers Systems Ltd.'s checking account, they disagree as to how that arose. Groveman states that Randy Schleger never had authorization to sign the resolution. Randy Schleger states that he was given signing privileges because he "was an equal partner in the business, and I thought, an equal shareholder." *Schleger's Federal Affidavit,* at p. 7. With regard to the banking resolution signed by Randy Schleger as vice president of Panther, each party takes opposite positions as to how the signature was obtained.

Absent far more substantial documentation, the court finds that Randy Schleger has never been a shareholder, officer or director of Panther Systems Ltd. A bank resolution form listing Randy Schleger as a shareholder and officer is inconclusive absent authorization by the corporation. *See Panther Systems Ltd. v. Groveman,* Index No. 5770/91 at 2 (Nassau Sup.Ct. June 4, 1991).

#### 2. Joint Venture

While there is little doubt that a relationship between Groveman and Randy Schleg-

---

**5.** No preliminary injunction hearing was held in this case. During arguments of the motion, plaintiffs stated that "this preliminary injunction motion of plaintiff may be decided on the papers because as a matter of law under the doctrine of res judicata plaintiffs are entitled to [a] preliminarilly [sic] [injunction] ... which they seek based on the prior state court proceeding." *Transcript* at p. 2 (Sept. 27, 1991). Defendants did not object to this argument.

This opinion constitutes the Court's findings of facts and conclusions of law as required by Fed.R.Civ.P. 52(a) and 65(d). Although a hearing is generally required on a motion for a preliminary injunction, (*see Fengler v. Numismatic Americana, Inc.,* 832 F.2d 745 [2d Cir. 1987] ), where the parties are content, as here, to rest on affidavits submitted to the Court, the right to an evidentiary hearing is waived. *Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 256 (2d Cir.1989). *See Harrison/Erickson, Inc. v. Chicago Bulls Ltd., Partnership,* No. 91–1585, 1991 WL 51118 n. 1 (S.D.N.Y. April 3, 1991); *Fireman's Ins. Co. of Newark, N.J. v. Keating,* 753 F.Supp. 1146, 1149 n. 4 (S.D.N.Y. 1990).

**6.** Defendants do not object from being enjoined from "using the name Panther in any way or representing them to be—representing themselves to be affiliated with Panther in any way." *Transcript* at 5.

er once existed, the issue is whether there existed a fiduciary duty between the parties and to what extent that duty extended. Both sides can agree that at a minimum Randy Schleger was an employee of Panther Systems Ltd.

The court has not been provided a written agreement establishing a joint venture signed by both Groveman and Randy Schleger. Nor has an alleged joint venture ever been mentioned in any of the corporate documents supplied to the court. The court notes that there is no evidence that the three hundred thousand dollars was ever tendered to Groveman, notwithstanding, Randy Schleger's sworn affidavit in state court that he was "a 50% shareholder ... in Panther Systems Ltd." *Schleger's State Affidavit*, at p. 1.

The court also notes Randy Schleger's change in position in the state proceeding from an alleged "50% shareholder" of Panther Systems Ltd. to a "joint venturer" in the federal proceeding. Absent from Schleger's state court affidavit is any references to a then existing "joint venture" between Groveman and Schleger. Schleger's statement in his state court affidavit that "[w]e *were to be* equal 'partners' in this venture" (*Schleger's State Affidavit*, at p. 2 [emphasis added]) belies his contention that a joint enterprise ever existed. The past tense use of the term "were" in conjunction with the verb "to be" indicates that while it might have been intended that some kind of relationship between Groveman and Schleger was contemplated, such a relationship never came to fruition. This seems to be true even prior to the state court suit and eventual dismissal of Schleger's state action with prejudice.

 Even assuming there was a joint venture, Randy Schleger had a fiduciary duty to Groveman, the other joint venturer, not to steal or disclose trade secrets. "In joint venture the participants owe one another a fiduciary duty with respect to matters related to the joint venture. This rule applies to trade secrets." *Future Plastic, Inc. v. Ware Shoals Plastics, Inc.,* 340 F.Supp. 1376, 1383 (D.S.C.1972); *see Durango Herald, Inc. v. Riddle,* 719 F.Supp.

941, 945 (D.Col.1988) ("[w]hether the duty flows from the [covenant not to compete] or the fiduciary duties of partners, one partner may not exploit the unique assets of the joint venture to the detriment of the other"). Members of a joint venture have a relationship "of mutual trust and confidence." *Timely Products Corporation v. Arron,* 523 F.2d 288, 303 (2d Cir.1975). The Restatement of Torts supports plaintiffs' position that a fiduciary duty exists between members of a joint venture. Specifically,

> [w]hether or not there is a breach of contract, the rule in this Section subjects the actor to liability if his disclosure or use of another's trade secret is a breach of the confidence reposed in him by the other in disclosing the secret to him. The chief example of a confidential relationship under this rule is the relationship of principal and agent ... Such is also the relationship between partners or other joint venturers.

*Timely Products,* 523 F.2d at 303 (*quoting* Restatement of Torts § 757, at 13 [1939]). Moreover, Randy Schleger admits to his fiduciary duty in stating that

> I also admit that I opened a Panther Systems account at Chase Manhattan Bank. The purpose of this account was to hold all amounts made by Panther Systems, so that, when the time came for the matter to be settled between me and Lloyd, I would be able to account for all amounts I made. This would facilitate a division of the business.

*Schleger's Federal Affidavit,* at p. 17. Check signing privileges do not, in and of itself, establish Randy Schleger as an equal joint venturer. While there is no question that Randy Schleger was at least an employee of Panther Systems Ltd, there are serious enough questions going to the merits to support the issuance of a preliminary injunction, *to wit,* whether Randy Schleger breached his fiduciary duty to Groveman in the alleged "joint venture." Based on the above, the court finds that regardless of the position attributed to Randy Schleger *viz.* Panther Systems Ltd., Randy Schleger owed a fiduciary duty to Lloyd Groveman

and Panther Systems Ltd. Moreover, the court finds that Randy Schleger violated that duty.

### B. *Confidential Information*

■ According to Groveman, Randy Schleger was entrusted with confidential and proprietary information such as (1) the prices which Panther Systems Ltd.'s customers were willing to pay for computers and computer equipment; (2) the frequency with which Panther System Ltd.'s customers may be productively solicited for new sales; (3) the products which Panther Systems Ltd.'s customers have not yet ordered, but could be expected to purchase in the near future; and (4) the identity of key contact persons responsible for purchasing, at various Panther Systems Ltd.'s various customers. *See Plaintiffs' Reply to Defendants' Supplemental Memorandum of Law in Opposition to [Plaintiffs'] Motion for Preliminary Injunction* at p. 5 ("Plaintiffs' Reply"). Plaintiffs claim that Schleger allegedly misappropriated Panther Systems Ltd.'s "list of the companies and individuals who responded to reviews of Panther Systems' computers in *PC Magazine,* and who expressed interest in the company's products, and had requested that Panther Systems contact them and/or send them information, regarding its computer systems." *Id.* Thus, plaintiffs seek *inter alia* to enjoin defendants, their officers, agents, employees and attorneys and all persons in active concert with them from contacting or soliciting or filling orders or responding to inquiries or transacting business with any customer or prospective customer of plaintiffs, whether a private or *public* entity, whose identity was learned by defendants or agents or employees of defendants in the course of working with plaintiffs or from customers' lists obtained from plaintiffs or from inquiries directed to plaintiffs. *See Plaintiffs' Proposed Revised Order,* at pp. 2–3.

"In the absence of a breach of fiduciary duty, a covenant not to compete [7], or fraud, an at will employee is free to compete with his former employer." *Headquarters Buick–Nissan, Inc. v. Michael Oldsmobile,* 149 A.D.2d 302, 539 N.Y.S.2d 355, 356 (1st Dep't 1989); *see Consolidated Brands, Inc. v. Mondi,* 638 F.Supp. 152, 156 (E.D.N.Y.1986) (*quoting Velo–Bind, Inc. v. Scheck,* 485 F.Supp. 102, 109 [S.D.N.Y. 1979]) ("fiduciary obligation is said to be inherent in any employer-employee relationship 'where the customer list is protectable as a trade secret' "). "An aggrieved plaintiff need not show that the information it seeks to protect is vital to its business, but only that the information would provide the unauthorized user of it with an unfair competitive advantage which it would not otherwise have enjoyed." *Ecolab Inc. v. Paolo,* 753 F.Supp. 1100, 1111 (E.D.N.Y.1991) (*citing Greenwich Mills Co., Inc. v. Barrie House Coffee Co., Inc.,* 91 A.D.2d 398, 405, 459 N.Y.S.2d 454, 459 [2d Dep't 1983]). Moreover, "an employee's use of an employer's trade secrets or confidential customer information can be enjoined even in the absence of a restrictive covenant when such conduct violates a fiduciary duty owed by the former employee to his former employer." *Churchill Communications Corp. v. Demyanovich,* 668 F.Supp. 207, 211 (S.D.N.Y.1987); *see Durango Herald,* 719 F.Supp. at 945.

### 1. Customer Identity
#### a. *Customer List*

■ The customer list at issue which defendants allegedly misappropriated consists of "companies and individuals who responded to reviews of Panther Systems' computers in *PC Magazine,* and who had expressed interest in the company's products, and had requested that Panther Systems contact them, and/or send them information, regarding its computer systems." *Plaintiffs' Reply* at p. 5.

In this case, the court does not find that the above "potential" customer list is entitled to a lesser degree of protection than an "actual" customer list. The article in *PC Magazine* and any names of potential cus-

---

7. In the instant case, Groveman and Randy Schleger never executed any sort of agreement memorializing their business relationship. As a result, a written covenant not to compete did not exist.

tomers derived from a review in that magazine is due to the quality of Panther Systems Ltd.'s product and Groveman's prior experience in the computer field, including his educational background and prior employment. Accordingly, if defendants, or their officers, agents and employees and all persons in active concert or participating with them, have either retained such responses or have copies of any of these responses as a result of reviews in *PC Magazine*, they must be returned to plaintiffs. Moreover, such customer list may not be used or copied in any way by any of the described persons.

### b. Knowledge of Customer's Identity
#### i. Private Entities

However, even if defendants have not physically appropriated such a list, "a former employee may not 'solicit the customers of his former employer if they would be unknown to the employee but for information obtained during his prior employment.'" *Abraham Zion Corp. v. LeBow*, 593 F.Supp. 551, 569 (S.D.N.Y.1984), *aff'd*, 761 F.2d 93 (2d Cir.1985) (*citing Ability Search, Inc. v. Lawson*, 556 F.Supp. 9, 15 [S.D.N.Y.1981], *aff'd*, 697 F.2d 287 [2d Cir. 1982]). Here, defendants claim that they are not in possession of any such list.

Thus, even if defendants do not possess plaintiffs' customer list, they may still be enjoined because

> where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information by an employee for use in his future business or employment is ... unfair competition.

*Ecolab*, 753 F.Supp. at 1111 (*citing Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical Corp.*, 135 A.D.2d 889, 522 N.Y.S.2d 287, 290 [3d Dep't 1987] ["an employee's

illegal physical taking or copying of an employer's files or confidential information constitutes actionable unfair competition"]).[8]

The fact that defendants *could* have secured the names of likely customers for [plaintiff's product] through alternative methods should not preclude denominating the information which was disclosed as a trade secret. While the names of potential customers may have been obtainable from a simple examination of a classified directory, information as to the retailers who were actually purchasing plaintiff's product could not have been so secured. Moreover, data concerning the amount of the product each customer purchased, compiled on a monthly basis, was certainly not obtainable in this way. Finally, as we have had occasion to note before, resolution of the issue in a case like this depends not upon how a defendant could have acquired the information, *but rather upon how he did in fact actually acquire it.* 'It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment.' [citation omitted].

*Heyman v. Ar. Winarick, Inc.*, 325 F.2d 584, 590–91 (2nd Cir.1963) [emphasis added]; *see FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2d Cir.1984) ("[t]he record indicates that it would be very difficult if not impossible for [defendant] to discover [plaintiff's] clients without [defendant's] help. The fact that some of the names could conceivably have been gleaned by [defendant] by 'backtracking' from [plaintiff's] retail customers does not prove that these names were readily available to [defendant]"); *contra Reed*,

---

**8.** *See Allan Dampf, P.C. v. Bloom*, 127 A.D.2d 719, 512 N.Y.S.2d 116, 117 (2d Dep't 1987) (even without a non-competition clause, court found misappropriation and exploitation of confidential information of former employee an abuse of a trust and improper use of information to solicit plaintiff's patients where defendant copied, *inter alia*, a "recall list" of patients, containing names, addresses, telephone numbers, date of last appointment and date due for next checkup. Even though the due dates were not readily ascertainable, they were based on the physician's past treatment and judgment concerning the frequency of future checkups).

*Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 309, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590, 594 (1976) (injunction reversed where customers readily discoverable through public sources and solicitation was through Dun & Bradstreet's Million Dollar Directory where even the name of the contact person was listed).

On the other hand, "where information obtained while employed, such as the identity of customers, is not secret but generally available from public sources to members of the trade, a former employee may disclose it without breaching his fiduciary duty of loyalty to his employer" (*LeBow*, 593 F.Supp. at 570 [*citing e.g. Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564 [1978]] ), but only if that "employee has [not] engaged in an act such as stealing or memorizing his employer's customer lists [citation omitted]." *Walter Karl v. Wood*, 137 A.D.2d 22, 528 N.Y.S.2d 94, 98 (2nd Dep't 1988). Consequently, a former employee " 'may solicit customers of his former employer who are openly engaged in the business or whose identity is readily available to him.' " *Id.* (*citing Ability*, 556 F.Supp. at 15). Defendants have failed to properly substantiate this defense.

"Knowledge of the intricacies of a business operation does not necessarily constitute a trade secret and absent any wrongdoing it cannot be said that a former employee 'should be prohibited from utilizing his knowledge and talents in this area.' " *Catalogue Service of Westchester, Inc. v. Henry*, 107 A.D.2d 783, 784, 484 N.Y.S.2d 615, 616 (2nd Dep't 1985) (*quoting Reed*, 386 N.Y.S.2d at 680, 353 N.E.2d at 594). Moreover, "[s]olicitation of plaintiff's customers as a product of defendants' casual memory is permissible, given the absence of a restrictive covenant." *Metal & Salvage Association, Inc. v. Siegel*, 121 A.D.2d 200, 503 N.Y.S.2d 26, 27 (1st Dep't 1986).

Defendants' customer contacts could not have been acquired by defendants "but for" their association with plaintiffs. Defendants uncontested bad faith in misrepresenting themselves to plaintiffs' customers has substantially led to this conclusion. Only in the most general sense, can the names of plaintiffs potential or actual customers be considered available from public sources. While defendants could replicate the names of companies and individuals who are potential or actual customers of plaintiffs, this could not be done simply looking through directories or public listing. Considerably more work and research is required. Plaintiffs contacts were as a direct response to a review in *PC Magazine* and defendants' knowledge of them goes well beyond knowing the intricacies of the business. According to plaintiffs, the information imparted to defendants was more than merely names of potential or actual clients, but included their prior computer usage, present computer needs and prices they were willing to pay to accomplish those objectives.

Based on the above, defendants should be enjoined from soliciting any business from Eaton Corporation or Telephonics Corporation, Groveman's former employer, or any other private customer of plaintiffs as of January 19, 1991 or any private entity whose identity was learned by defendants or agents or employees of defendants during the course of association with plaintiffs or from customer lists of plaintiffs or from inquiries directed to plaintiffs.

ii. Public Entities

Defendants will not be enjoined from doing business with public entities who solicit public bids. Generally, names of customers ascertainable through public sources will not be protected as trade secrets. The courts in *Velo–Bind, Inc. v. Scheck*, 485 F.Supp. 102 (S.D.N.Y.1979), *Town & Country House & Home Services, Inc. v. Newberry*, 3 N.Y.2d 554, 170 N.Y.S.2d 328, 147 N.E.2d 724 (1958) and *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 425, 278 N.E.2d 636, 637 (1972), discussed this issue in detail. In *Velo–Bind*, 485 F.Supp. at 102, defendants argued that the list was "culled from public sources such as Martindale–Hubbell's directory of law firms and financial list." *Id.* at 107. The court rejected that argument noting that "although all of their [custom-

ers'] names might appear in publicly available, [the customers] were nowhere denominated as Velo–Bind machine owners except on the customer lists maintained by Velo–Bind." *Id.* In *Velo–Bind,* the court characterized defendants' action as "siphoning off plaintiff's carefully gleaned customers." *Id.* at 109.

Likewise, in *Town & Country,* the court noted that "customers of plaintiff were not and could not be obtained merely by looking up their names in the telephone or city directory or going to any advertised locations, but had to be screened from among many other housewives who did not wish [such] services, but preferred to do their own housework." *Town & Country,* 170 N.Y.S.2d at 332, 147 N.E.2d at 726. As noted in *Town & Country,*

> even where a solicitor of business does not operate fraudulently under the banner of his former employer, he still may not solicit the latter's customers who are not openly engaged in business in advertised locations or whose availability as patrons cannot readily be ascertained but 'whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight have built up' [citation omitted].

*Town & Country,* 170 N.Y.S.2d at 331, 147 N.E.2d at 726. In neither of these cases had the defendants entered into covenants not to compete.

However, in *Leo Silfen,* 29 N.Y.2d at 389, 328 N.Y.S.2d at 425, 278 N.E.2d at 637, a customer list was found not to be a trade secret because "plaintiffs' customers are likely, if not known, users of the employers' merchandise and engaged in business at advertised locations." The court found that where customers are "readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products, trade secret protection would not attach and courts will not enjoin the employee from soliciting his [former] employer's customers." *Silfen,* 328 N.Y.S.2d at 427, 278

N.E.2d at 639. Thus, the issue becomes how much work will it take to replicate plaintiffs list of customers.

This is exemplified in *Webcraft Technologies, Inc. v. McCaw,* 674 F.Supp. 1039 (S.D.N.Y.1987) where the defendant claimed that identity of (1) customers and prospects and the contact person at each customer and prospective customer and (2) knowledge of prices and pricing methods were generally known throughout the mass market printing community and thus not protectable as trade secrets. While the court agreed that a prospective customer list compiled from 10,000 names may not be a trade secret, the court held that a list of current customers are. Specifically, the court noted that

> it is a long difficult process to educate and convert a prospective customer to the benefits of [plaintiff's] process. Thus the confidential value of [plaintiff's] customer list lies not only in its identification of *someone's* customers for printing, but more importantly, especially for competitors in the in-line process like [defendant], in that it identifies customers who have learned and have bought the benefits of in-line finishing.

*Id.* at 1045 [emphasis added].

The court in *Webcraft* noted that these customers were only discoverable with great effort and where patronage of such customers was secured through the expenditure of considerable time and money. *See Silfen,* 328 N.Y.S.2d at 428, 278 N.E.2d at 640. The court in *Webcraft* distinguished *Silfen* because there, the customers were merely developed through widespread canvasing. As a result, the court in *Webcraft* found that the identity of contacts at the plaintiff's customers, plaintiff's pricing and plaintiff's customer preferences protectable as protectable trade secrets. The court noted these characteristics were accumulated with considerable effort for the benefit of plaintiff, were not generally available information and were maintained in confidence. *Webcraft,* 674 F.Supp. at 1046.

Again in *Business Intelligence Services, Inc. v. Hudson,* 580 F.Supp. 1068, 1072

(S.D.N.Y.1984), the court found that plaintiff would suffer irreparable harm if defendant went to work for a competitor because defendant has "extensive knowledge" of plaintiff's computer software and client information. The disclosure of defendant's knowledge of plaintiff's computer software system "would allow a competitor to develop or improve its computing system with little or no effort." *Id.*

In particular, courts have been reluctant in instances of public bidders to enjoin competitors from bidding on public contracts or responding to a public requests for proposals. In *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 274 A.2d 577 (1971), the court reversed the grant of preliminary injunction where plaintiff sought enforcement of an agreement not to compete. Plaintiff's primary position was that "its bidding procedures and constituent elements represent trade secrets or confidential information which are lawfully and justly entitled to protection against competitors." *Id.* 274 A.2d at 580. The court noted that

[t]he plaintiff may have legitimate interests in protecting its customer relationships but the record before us does not support any preliminary relief in this connection any more than it does in connection with plaintiff's suggested trade secrets or confidential information. Most of the plaintiff's customers are governmental entities, along with prime contractors doing work for them, and most of the work involves public bidding. The industry as a whole is fully aware when public work is available and the determining factor is generally price rather than personal consideration. There appears to be little likelihood that [defendant] would be in any position to harm plaintiff's relationships with the governmental entities or with prime contractors doing work for them.

*Whitmyer Bros.*, 274 A.2d at 583–84. Likewise, in *Abbott Redmont Thinlite Corp. v. Redmont*, 324 F.Supp. 965, 969 (S.D.N.Y.1971) (denying injunction), *aff'd*, 475 F.2d 85 (2d Cir.1973) (affirming in part and granting injunction in part), the court found that defendant had not used any confidential information where "no secret customer lists" were involved and that "[a]nyone familiar with the business would know of the existence of potential buyers of skylights." Specifically,

bids put in by plaintiff-corporation to the five contractors involved here were far from secret. They were published in two different trade publications. Moreover, the bids were not sealed but rather were the subject of open bidding and negotiation between contractor and interested subcontractors.

*Id.* at 969. In *Abbott*, defendant was a mere employee and the oral contract governing his duties did not contain a covenant against competition. *See Bonacorso Const. Co. v. Master Builders, Inc.*, No. 87–1827, 1991 WL 72796 at *7 (D.Mass. April 24, 1991) (no trade secret or confidential information where "specifications of the work to be done can be ascertained by looking at the bid which is public information"); *Data Communication, Inc. v. Dirmeyer*, 514 F.Supp. 26, 33 (E.D.N.Y.1981) (court noted that "enforcement of the restrictive covenant presupposes that [defendant] possesses trade secrets and confidential information.... The majority of [plaintiff's] work is obtained through public bidding and it is well settled that trade secret protection does not attach to 'customers' names ... readily ascertainable from sources outside its business' " [citation omitted] ).

■ The identity of a customer obtained by plaintiffs as a result of a winning public bid falls within information "readily ascertainable outside the employer's business." *Silfen*, 328 N.Y.S.2d at 427, 278 N.E.2d at 639. While it is true that a vendor who has previously won a contract from a public entity may be more knowledgeable about that entities bidding practices, that knowledge is often "readily ascertainable" by any potential vendor by contacting directly the public entity. The award of a contract by a public entity through a public bid is a matter of public record. In *Support Systems Associates, Inc. v. Tavolacci*, 135 A.D.2d 704, 522 N.Y.S.2d 604 (2nd Dep't 1987), the court found that even where a public bid was involved certain information

imparted to the former employee by the employer was protected as a trade secret. In particular, the "pricing and cost information provided to [defendant] was ... confidential because if it were known to competitors, they would be in a position to underbid the plaintiff and consequently win the contracts that plaintiff was competing for." *Id.* 522 N.Y.S.2d at 605–06.

In the instant case of the sixteen identified entities which plaintiffs seek to enjoin defendants from soliciting fourteen are public entities. *See Plaintiffs' Proposed Revised Order*, at p. 2. Thus admittedly, even though defendants misappropriated the identity of certain public entities from plaintiffs, barring defendants from submitting proposals to bid on a public contract is inconsistent with public entities entertaining requests for proposals from any source. Plaintiffs did *not* obtain these customers by "siphoning off" plaintiffs' carefully *"gleaned* customers." *See Velo-Bind,* 485 F.Supp. at 109. In this case, plaintiffs obtained these customers by winning a contract through a public bid. It should be left up to the public entity to determine whether the winning bidder is "responsible."

The court does not find that defendants have gained any unfair advantage over plaintiff with respect to increasing the possibility of their being awarded a contract through a public bid. The court acknowledges that defendant might have learned certain pricing strategies from his former employer, but the court must leave it up to the public entity to award contracts to the most responsible bidder. While the court believes that defendant's "pursued a particular course of conduct with the intention of injuring or destroying his former employer's business," *Churchill,* 668 F.Supp. at 213 (*quoting Annotation, Former Employee's Duty, In Absence of Express Contract, Not to Solicit Former Employer's Customers or Otherwise Use His Knowledge of Customer Lists Acquired in Earlier Employment,* 28 A.L.R.3d 7, 112 at § 22[a] [1969] ), the court does not find that defendant should be precluded from competitively bidding for public contracts.

The court recommends that defendants be enjoined from doing business with Eaton Corporation or Telephonics Corp., Groveman's prior employer or any other private customer of plaintiffs as of January 19, 1991 or private entity whose identity was learned by defendants or agents or employees of defendants during the course of association with plaintiffs or from customer lists of plaintiffs or from inquiries directed to plaintiffs. The court does not adopt plaintiffs' request that defendants be enjoined from indicating that the experience to be expected from Mr. Schleger will be the same as that previously provided to them by Panther Systems. *See Plaintiffs' Reply* at p. 6.

2. Suppliers

Plaintiffs seek to enjoin defendants from doing business with plaintiffs' suppliers. In general, the identity of suppliers is not a trade secret entitled to protection since they can be readily learned in any productive industry. *See Den–Tal–Ez, Inc. v. Siemens Capital Corp.,* 389 Pa.Super. 219, 566 A.2d 1214, 1229–30, 9 U.S.P.Q.2d 1932, 1942–43 (1989); *Metal,* 503 N.Y.S.2d at 27–28 (injunction reversed as to supplier lists, but granted as to records of suppliers' solicitations where defendants appropriated such files; court enjoined defendants from utilizing the information in these files and required the return of these business records to plaintiffs); *Buffalo Imprints, Inc. v. Scinta,* 144 A.D.2d 1025, 534 N.Y.S.2d 55, 57 (4th Dept' 1988) (injunction reversed as to supplier list where "suppliers of novelty items are compiled and distributed by a national trade organization ... and that most suppliers exhibit their wares at trade shows which are open to the general public").

In *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244 (3d Cir.1985), the court held that to the extent that knowledge of alternate suppliers of plaintiff's product (where only two out of two hundred ball bearing suppliers in the nation make plaintiff's product), and "their respective prices, was dependent on *knowing secret specifications,* this information is entitled to trade secret protection." *Id.* at 1257 [emphasis

added]. However, "knowledge of the identity of alternate suppliers ... was not protectable as a trade secret, in and of itself, as that knowledge was 'already in the hands of third parties,' the suppliers, 'who have every incentive, and every right, to disclose it to their customers.'" *Multitherm Corp. v. Fuhr*, No. 89–6151, 1991 WL 146233 (E.D.Penn. July 24, 1991) (*quoting SI Handling*, 753 F.2d at 1257); *contra Sigma Chemical Co. v. Harris*, 794 F.2d 371 (8th Cir.1986) (vendor files developed over forty years containing supplier's name and price and quantity of information regarding products purchased from vendor is protected as a trade secret). Here, plaintiffs have not demonstrated that their suppliers' identity is proprietary information. Accordingly, defendants will not be enjoined from doing business with plaintiffs' suppliers.

## CONCLUSION

As consented to by the parties, the court recommends that the New York Telephone Company place a recorded message on telephone number (516) 466–6108 which will indicate to callers where they can contact plaintiffs and defendants and that in all other respects the telephone number should be discontinued. Also as consented to by the parties, the court recommends that defendants, their officers, agents and employees and all persons in active concert or participating with them, be enjoined from using the Panther trademark and logo and the Panther Systems tradename or any other similar trademark, name or logo or using any copyrighted sales literature of plaintiffs.

The court recommends that the above defendants and defendant and their employees, agents or representatives be enjoined from (1) using or passing off as their own any office sign, labels, business card, stationary, promotional literature, business form, containers, name or other indicia or insignia similar or deceptively similar to any used or formally used by plaintiffs; (2) stating or intimating that Defendants' computer hardware and software or any other goods are manufactured, sold or warranted by plaintiffs; and (3) using published reviews of plaintiffs' products.

The court also recommends that defendants return to plaintiffs any mail addressed to plaintiffs, computer hardware or software, business and financial records, customer lists or any other internal record used by Panther Systems Ltd. and are enjoined from dissipating, concealing, altering, diverting, destroying, mutilating, taking into custody, or disposing of, in any manner or using or copying all or any portion of such documents.

In addition, the court recommends that defendants be enjoined from doing business, on behalf of any entity involved in the computer business, with Eaton Corporation or Telephonics Corp., Groveman's prior employer, or any other private customer of plaintiffs as of January 19, 1991 or private entity whose identity was learned by defendants or agents or employees of defendants during the course of association with plaintiffs or from customer lists of plaintiffs or from inquiries directed to plaintiffs. These contacts would not have been acquired by defendants but for their association with plaintiffs.

Lastly, the court recommends that defendants, their officers, agents and employees and all persons in active concert or participating with them be enjoined from (1) soliciting and collecting from customers of plaintiffs any payment of monies due plaintiffs, (2) soliciting, collecting and taking custody over material assets belonging to plaintiffs being held by third parties and (3) return and turnover to plaintiffs all records of bank accounts, deposits and withdrawal slips and the monies held in the name of Panther Systems Ltd. Panther Systems II, Ltd. or Computers Anonymous.

Defendants are not enjoined from doing business with any public or quasi-public customer of Panther System's Ltd. which they obtained through a public bid.

Defendants' knowledge of plaintiffs' suppliers, in addition to their possession of a supplier list, if any, is not protectable as a trade secret. Accordingly, defendants may solicit orders from plaintiffs' suppliers as Light–Speed Systems Ltd. provided that

they do not use the Panther tradename, trademark, logo, any Panther promotional material or indicate their prior connection to any Panther entity.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e); *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2d Cir.1989) (per curiam).

Dated: Uniondale, New York

November 6, 1991